## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**Arkansas Times LP**                                                     **Plaintiff**

v.                                    Case no. *4:18cv914-BSM*

**Mark Waldrip, John Goodson,**
**Morril Harriman, Kelly Eichler,**
**David Pryor, Stephen Broughton,**
**C.C. Gibson, Sheffield Nelson,**
**Tommy Boyer, and Steve Cox, in their**
**official capacities as Trustees of**
**the University of Arkansas Board of**
**Trustees.**

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 11 2018

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

## BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
## AND DECLARATORY RELIEF

### Introduction

This is an action to protect the constitutional rights to engage in political expression and

association.  A portion of Act 710 of 2017, codified at  Ark. Code Ann. § 25-1-503 ("the Act"),

requires those who desire to contract with governmental entities in this state to certify that they

currently are not boycotting Israel and will not boycott Israel during the duration of their

contract.  However, the Act permits a contractor to boycott Israel if the contractor agrees to

provide the goods or services for at least a twenty percent (20%) reduction in the contract

amount to be paid by the state.  The Act´s certification requirement violates the First and

Fourteenth Amendments of the United States Constitution by requiring contractors, including

Plaintiff in this action, to either refrain from boycotting Israel or to agree to a substantial

reduction in the contractual amount paid if they want to do business with the state.

1

Plaintiff Arkansas Times LP has a long history of contracting to run advertisements in the *Arkansas Times* for Pulaski Technical College ("PTC"), which on February 1, 2017, became the University of Arkansas, Pulaski Technical College ("UAPTC"). In October of this year, Plaintiff was required—for the first time—to sign a pledge that it would refrain from boycotting Israel as a condition to being awarded new advertising contracts. (Plaintiff was not offered the option of agreeing to a reduction in the contractual amount paid.) Plaintiff refused to sign the pledge, because the boycott pledge is unconstitutional, and was not awarded the new contracts as a result. (Plaintiff would have refused a 20% reduction in payment as well, if it had been offered.) Plaintiff brings a facial challenge to have declared that portion of the Act which requires the certification unconstitutional and to invalidate the offending provision in its entirety. In addition, it seeks to preliminarily enjoin the University of Arkansas Board of Trustees ("UABT") from any enforcement of the Act's anti-boycott certification requirement.

### The Challenged Act

In 2017, the Arkansas Legislature passed Act 710, which became effective August 3, 2017.

The anti-boycott section of the Act provides:

Prohibition on contracting with entities that boycott Israel.

(a) Except as provided under subsection (b) of this section, a public entity shall not:

(1) Enter into a contract with a company to acquire or dispose of services, supplies, information technology, or construction unless the contract includes a written certification that the person or company is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel; or

(2) Engage in boycotts of Israel.

(b) This section does not apply to:

> (1) A company that fails to meet the requirements under subdivision (a)(1) of this section but offers to provide the goods or services for at least twenty percent (20%) less than the lowest certifying business; or
>
> (2) Contracts with a total potential value of less than one thousand dollars ($1,000).

Ark. Code Ann. § 25-1-503.

The Act defines "boycott Israel" and "boycott of Israel" to mean:

> [E]ngaging in refusals to deal, terminating business activities or other actions that are intended to limit commercial relations with Israel, persons or entities that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner.

Ark. Code Ann. § 25-1-502.

The Act seeks to suppress participation in political boycott campaigns aimed at Israel and territories where Israel exerts control. These campaigns typically are a protest against the Israeli government's treatment of Palestinians and its occupation of Palestinian territories.

### The Facts

Plaintiff operates the *Arkansas Times,* a weekly newspaper of general circulation in this state, as well as other special interest publications. The publisher and CEO of the *Arkansas Times* is Alan Leveritt. He is also the CEO and a principal of Arkansas Times LP. Leveritt Decl., Exh. 1 to Motion for Preliminary Injunction, ¶ 2. For many years, Plaintiff has regularly contracted with PTC, and now with the UABT, to run advertisements for PTC, now UAPTC, in the *Arkansas Times* and other Arkansas Times LP publications in return for payment for this service. Exh. 1, ¶ 5. In October 2018, Plaintiff and UAPTC were preparing to enter into new contracts for additional advertising in the *Arkansas Times.* At that time, the UAPTC Director of Purchasing and Inventory informed Mr. Leveritt that he would have to sign a certification stating that Plaintiff is not currently engaged in, and agrees for the duration of the contract not to engage

in, a boycott of Israel. UAPTC informed Mr. Leveritt that absent this certification, UABT would refuse to contract with Plaintiff for any additional advertising. Exh. 1,¶ 3. Mr. Leveritt, as CEO of Arkansas Times LP, declined to sign the certification. It is unacceptable for Plaintiff to enter into an advertising contract with the University of Arkansas that is conditioned on the unconstitutional suppression of protected speech under the First Amendment. Moreover, Plaintiff is unwilling to accept a 20% reduction in payment by UAPTC for its advertising services. Exh. 1, ¶ 4.

Plaintiff is ready, willing, and able to enter into new or renewed advertising contracts for UAPTC with UABT, but refuses to sign the required anti-boycott certification. Exh. 1, ¶¶ 5, 7. Because of the certification requirement, Mr. Leveritt and UABT have no present contract to advertise UAPTC and no future prospect to enter into one. As a result of Plaintiff's refusal to sign the anti-boycott pledge, as of December 11, 2018, UAPTC has failed to offer Plaintiff at least two new contracts for advertising in the *Arkansas Times*, each of which would have been for an amount in excess of $1,000. Exh. 1, ¶ 5. In view of its long contractual history with PTC and UABT on behalf of UAPTC, Plaintiff reasonably expected that it would be awarded additional advertising contracts in the future. In 2016, Plaintiff contracted with PTC for 22 separate contracts in amounts over $1,000 for PTC ads; in 2017, 36 such contracts were executed with UABT; in 2018, 25 such contracts were executed prior to the anti-boycott pledge requirement. Exh. 1, ¶ 5. Plaintiff's refusal to sign the anti-boycott pledge means that new such contracts with UABT will not be executed as long as the Act remains in force. Exh. 1, ¶ 5. As a result of the Act's certification requirement, Plaintiff has sustained substantial monetary damages, which are not recoverable against UABT in a court of law and which will continue into the future if the certification requirement is not invalidated. Exh. 1, ¶ 7.

## Summary of Argument

The First Amendment to the United States Constitution prohibits Congress from making laws which abridge the freedoms of speech and association. U.S. CONST. amend. I. The Fourteenth Amendment prohibits states from depriving any person of life, liberty, or property, without due process of law. U.S. CONST. amend. XIV. The Fourteenth Amendment extends application of the First Amendment to actions of the states. *Id.*

## Argument

A preliminary injunction is necessary to remedy the irreparable injuries inflicted on Plaintiff, as well as public contractors throughout Arkansas, by the Act's unconstitutional certification requirement. In determining whether to grant a preliminary injunction in the Eighth Circuit the courts consider the following factors: "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc.* 640 F.2d at 114. However, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps–Roper v. Troutman,* 662 F.3d 485, 488 (8th Cir. 2011), *overruled on other grounds by Phelps-Roper v. City of Manchester,* 545 F.3d. 678 (8th Cir. 2012). It is well-settled law that a "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality). "If Plaintiffs can establish a sufficient likelihood of success on the merits of their First Amendment claims, he will also have established irreparable harm." *Phelps-Roper v. Nixon,* 545 F.3d 685, 689-90 (8th Cir. 2008) (internal quotations omitted), *overruled on other grounds* by *Phelps-Roper v. City of*

5

*Manchester; see also Marcus v. Iowa Pub. Television*, 97 F.3d 1137, 1140-41 (8th Cir.1996); *Kirkeby v. Furness,* 52 F.3d 772, 775 (8th Cir. 1995). The balance of equities, too, generally favors constitutionally-protected freedom of expression, *Nixon,* 545 F.3d at 691, and it is always in the public interest to protect constitutional rights. *Id; see also Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir.1998) (quotations omitted); *Kirkeby*, 52 F.3d at 775 (citing *Frisby v. Schultz*, 487 U.S. 474, 479 (1988)).

Plaintiff satisfies the *Dataphase* factors. Plaintiff is likely to succeed in demonstrating that the boycott certification provision of the Act is unconstitutional both on its face and as applied; therefore, the Court should issue a preliminary injunction restraining Defendants from enforcing the Act with respect to all UABT contractors.  In the alternative, if the Court declines to issue a preliminary injunction restraining enforcement with respect to all UABT contractors, it should issue a preliminary injunction restraining Defendants from enforcing the Act with respect to Plaintiff.

## Plaintiff Is Likely to Succeed on the Merits

At this stage of the proceedings, the role of this Court is not to determine the constitutionality of the challenged law, but rather the likelihood of Plaintiff's success in prevailing on its challenge to the law's validity. *See Glenwood Bridge, Inc. v. City of Minneapolis,* 940 F.2d 367, 371 (8th Cir. 1991) (noting that in considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win). Because Plaintiff is challenging the constitutionality of a state statute, it must demonstrate that it is likely "to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).  Under *Dataphase* and *Rounds*, Plaintiff can show such a likelihood.

Plaintiff is likely to succeed in demonstrating that the Act's certification requirement violates the First Amendment. Two federal courts have already enjoined Israel anti-boycott laws that are strikingly similar to the one at issue here, after concluding that those challenging the laws were likely to succeed on the merits of their claims because the laws are unconstitutional. *See Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018); *Jordahl v. Brnovich*, --- F. Supp. 3d ----, No. CV-17-08263-PCT-DJH, 2018 WL 4732493 (D. Ariz. Sept. 27, 2018), *appeal filed*. And with good reason. It is black letter law that the First Amendment rights to free association and free expression collectively encompass the right to participate in political boycotts. The state cannot condition government contracts on the forfeiture of this right. The Act violates this principle in two respects. First, it compels speech regarding contractors' political beliefs, association, and expression. Second, it restricts state contractors from engaging in protected expression and association, including both boycott participation and boycott-related speech, without any legitimate justification. *See Koontz*, 283 F. Supp. 3d 1020–24; *Jordahl*, 2018 WL 4732493, at *11. Plaintiff is likely to prevail on both of these theories, but need prevail on only one for this Court to issue a preliminary injunction.

### The First Amendment Protects the Right to Engage in Political Boycotts

Since the Supreme Court's landmark decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), it has been clear that the First Amendment protects the right to engage in politically-motivated boycotts. *Claiborne* concerned a boycott of white-owned businesses in Port Gibson, Mississippi. *Id.* at 889. The boycott, which was organized with the help of the NAACP, was meant to protest ongoing racial segregation and widespread racial inequality in the community. *Id.* Several merchants targeted by the boycott filed a lawsuit against the boycotters in Mississippi state court, seeking to recover business losses caused by the boycott and enjoin

future boycott activity. *Id.* The Mississippi Supreme Court rejected the boycotters' First Amendment defense and upheld the trial court's imposition of liability, concluding that "the entire boycott was unlawful" because the trial court had found that it was enforced through force, threats, and violence. *Id.* at 895.

The U.S. Supreme Court reversed, holding in relevant part that "the nonviolent elements of [the boycotters'] activities are entitled to the protection of the First Amendment." *Id.* at 915; The First Amendment right of association protects "the practice of persons sharing common views banding together to achieve a common end." *Id.* (quoting *Citizens Against Rent Control Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 294 (1981)) (internal quotation marks omitted). Although the Court acknowledged that "States have broad power to regulate economic activity," it did "not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case." *Id.* at 913. To the contrary, the Court observed that such "expression on public issues has always rested on the highest rung of the hierarchy of First Amendment values," *id.* (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)), and that "the practice of persons sharing common views banding together to achieve a common end," whether through association with a political party or a boycott campaign, "is deeply embedded in the American political process." *Id.* at 907 (quoting *Citizens Against Rent Control Coal. for Fair Hous.*, 454 U.S. at 294). Emphasizing that "speech concerning public affairs is more than self-expression; it is the essence of self-government," the Court reiterated the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* (citations and internal quotation marks omitted).

Since *Claiborne*, the Supreme Court repeatedly has reaffirmed that the First Amendment protects the right to engage in political boycotts. *See e.g., FTC v. Superior Court Trial Lawyers*

8

*Ass'n*, 493 U.S. 411, 428 (1998); *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S.

492, 508 (1988).  The principles laid down in *Claiborne* protect Plaintiff and all contractors with

public entities within the state of Arkansas. Indeed, relying on *Claiborne*, recent decisions from

courts in other jurisdictions have held that "the First Amendment protects the right to participate

in a boycott like the one punished by" anti-boycott laws similar to the one at issue here. *Koontz,*

283 F. Supp. 3d at 1012; *see also Jordahl*, 2018 WL 4732493 at *13 ("A restriction of one's

ability to participate in collective calls to oppose Israel unquestionably burdens the protected

expression of companies wishing to engage in such a boycott. The type of collective action

targeted by the Act specifically implicates the rights of assembly and association that Americans

and Arizonans use 'to bring about political, social, and economic change.'" (quoting *Claiborne*,

458 U.S. at 911)).

### The Act Violates the First Amendment By Requiring Public Contractors to Disavow Participation in Protected Boycotts

The Act violates the fundamental First Amendment guarantee against government

inquisition into people's protected political beliefs and associations. "If there is any fixed star in

our constitutional constellation, it is that no official, high or petty, can prescribe what shall be

orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess

by word or act their faith therein." *West Virginia St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642

(1943). One of the core purposes of the First Amendment is to preserve the "sphere of intellect

and spirit" from "all official control." *Id.* at 642. Since *Barnette*, the Supreme Court has

consistently emphasized that the right to hold one's personal "beliefs and to associate with others

of [like-minded] political persuasion" lies at the heart of the First Amendment. *Elrod v. Burns*,

427 U.S. 347, 356 (1976). To protect these rights, the First Amendment prohibits the state from

imposing ideological litmus tests as a condition of receiving government benefits.

The Supreme Court's decision in *Baird v. State Bar of Arizona* is instructive. There, the Court held that the First Amendment prohibited the state bar from requiring an applicant "to state whether she had ever been a member of the Communist Party or any organization 'that advocates overthrow of the United States Government by force or violence.'" 401 U.S. 1, 4–5 (1971). Writing for the plurality, Justice Black stated: "[W]hen a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment. Broad and sweeping state inquiries into these protected areas, as Arizona has engaged in here, discourage citizens from exercising rights protected by the Constitution." *Id.* at 6. Accordingly, when a State inquires into these protected areas, "a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest." *Id.* at 6–7. "And whatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Id.* at 7; *Speiser v. Randall*, 357 U.S. 513, 514–15 (1958) (invalidating a requirement that veterans applying for a property tax exemption subscribe to an oath disavowing the overthrow of the government and any support for foreign governments hostile to the United States). Along the same lines, the Supreme Court has made clear that public "employment may not be conditioned on an oath that one has not engaged, or will not engaged, in protected speech activities" or "associational activities within constitutional protection." *Cole v. Richardson*, 405 U.S. 676, 680 (1972).

The same principle applies to conditions on government contracts. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Society Int'l, Inc.*, 133 S. Ct. 2321, 2330 (2013) (holding that the government could not require organizations to adopt a policy opposing prostitution as a condition of receiving government funds) ("By requiring [funding] recipients to profess a specific belief, the Policy requirement goes beyond defining the limits of the federally funded

program to defining the recipient."); *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674–75 (1996) ("We have held that government workers are constitutionally protected from dismissal for refusing to take an oath regarding their political affiliation" (citations omitted)). Any attempt to penalize a government employee's or contractor's protected political beliefs or associations violates the First Amendment, unless the nature of the goods or services provided "requires political allegiance." *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999) (applying this test to employees); *see also O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 726 (1996) (holding that the same test applies to public employees and government contractors).[1]

The issue in a compelled speech case, such as this one, is the "validity of the asserted power to force an American citizen publicly to profess any statement of belief or engage in any ceremony of assent to one." *Id.* A person's reasons for declining to profess any statement of belief is immaterial. The Supreme Court reiterated this point in *Hurley*, holding that the organizers of a parade did not have to allow participants they did not want to include regardless of their reasons: "[W]hatever the reason, it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995). *See also Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*, 368 U.S. 278, 280–81 (1961).

---

[1] Here, there is no reason to believe that every single state contractor (or, indeed, that any state contractor) occupies a position requiring political allegiance. *See Barker v. City of Del City*, 215 F.3d 1134, 1138 (10th Cir. 2000) (the government "bears the burden of providing 'whether political association was an appropriate requirement for the effective performance of the public office involved'" (quoting *Jantzen*, 188 F.3d at 1253)). Even if some very small subset of state contractors does occupy such positions, the Act's application to *all* state contractors is substantially overbroad. *See Broadrick v. Oklahoma*, 413 U.S. 601 (1973)

Just as aspiring lawyers and government employees during the Cold War were required to swear that they were not members of the Communist party, state contractors in Arkansas are now required to certify that they are not participating in boycotts of Israel, nor will participate in boycotts during the duration of the contract. Of course, there are many people in Arkansas who do no business with Israeli companies or with companies doing business in Israeli settlements in the occupied Palestinian territories, for any number of reasons. The Act penalizes only those who refuse to disavow their participation or future participation in a boycott. Forcing the Arkansas Times LP to disavow boycott participation "is akin to forcing plaintiff to accommodate [Arkansas's] message of support for Israel." *Koontz*, 283 F. Supp. 3d at 1024. Thus, the Act prohibits Arkansas Times LP from receiving any state contracts, because it refuses to make an ideological and political pledge disavowing participation in disfavored boycott campaigns.

## The Act Violates the First Amendment By Prohibiting Public Contractors from Boycotting Israel

The Act also violates the First Amendment by imposing a blanket, content and viewpoint discriminatory restriction on government contractors' protected boycott participation, as well as their boycott-related speech and association. To determine whether the government has unconstitutionally infringed a government contractor's freedom of expression and association, courts apply the *Pickering* analysis used to assess government employee speech claims. *Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668, 674–75 (1996); *see also Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968).

Under this test, a public contractor retains the right to speak as a citizen on matters of public concern—and yet that is precisely what the Act prohibits. As discussed above, by requiring public contractors to certify that they are not engaged in boycotts of Israel, and by thereby prohibiting them from joining in such boycotts or expressing related speech, the Act

12

directly prohibits a wide amount of speech on a matter of public concern. Indeed, these boycotts are a form of "political speech lying at the core of the First Amendment." *Claiborne*, 458 U.S. at 915 (quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (5th Cir. 1979)) (internal quotation marks omitted); *see also Jordahl*, 2018 WL 4732493, at \*16; *Koontz*, 283 F. Supp. 3d at 1022.

Under *Pickering*, such government regulation is proper only if "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern." *Id.* at 568. Moreover, where, as here, the government proactively deters a "broad category of expression," the First Amendment harms are even graver. In such contexts, rather than engage in "a *post hoc* analysis of one [contractor's] speech and its impact on that [contractor's] public responsibilities . . . the Court weighs the impact of the ban as a whole— both on the employees whose speech may be curtailed and on the public interested in what they might say—against the restricted speech's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 467 (1995). The government carries a heavier burden in this context because, "[u]nlike an adverse action taken in response to actual speech," a prospective restriction "chills potential speech before it happens." *Id.* at 468. To satisfy the First Amendment, the state "must do more than simply 'posit the existence of the disease sought to be cured.'. . . It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Id.* at 475 (omission in original) (citation omitted). The test applied therefore "more closely resembles exacting scrutiny than the traditional *Pickering* analysis." *Janus v. Am. Fed'n of State, Cty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018).

The Act fails such scrutiny. There is no plausible justification for the anti-boycott pledge, except the desire to identify, punish, and chill disfavored political beliefs and associations. That justification cannot survive First Amendment scrutiny. *See Baird*, 401 U.S. at 7.

Far from being justified by a legitimate government interest, the Act is intended to accomplish precisely what *Claiborne* prohibits—the suppression of political boycotts, as well as related speech and association. Moreover, whereas *Claiborne* concerned a state law that at least theoretically applied to all political boycotts, the Act compounds the First Amendment violation by targeting specific boycotts based on their content and viewpoint. The Act prohibits state contractors from participating in boycotts of Israel, but allows them to participate in other political boycotts—including boycotts of other foreign countries and "reverse boycotts" targeting entities that are themselves engaged in boycotts of Israel.[2] "This is either viewpoint discrimination against the opinion that Israel mistreats Palestinians or subject matter discrimination on the topic of Israel. Both are impermissible goals under the First Amendment." *Koontz*, 283 F. Supp. 3d at 1022; *see also Jordahl*, 2018 WL 4732493, at \*17.

"The First Amendment generally prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *RAV v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citations omitted). The Act's selective prohibition is content discriminatory because it prevents state contractors from participating in boycotts based on the subject matter of those boycotts—i.e., Israel. *See, e.g.*, *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972) (holding that a Chicago ordinance exempting peaceful labor picketing from a general prohibition on picketing next to a school was content discriminatory because it "describe[d] permissible picketing in terms of its

---

[2] *See, e.g.*, Roz Rothstein & Roberta Seid, *Boycott the Boycotters*, Jewish Journal, Aug. 25, 2010, *available at:* http://jewishjournal.com/opinion/82483/ (last visited December 11, 2018).

subject matter"). "[T]he government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace. The First Amendment presumptively places this sort of discrimination beyond the power of the government." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). For this reason, content-based restrictions on expression are presumptively invalid and must satisfy the most exacting scrutiny. *E.g., United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816–17 (1981).

The category of content discrimination "includes a subtype of laws that go further, aimed at the suppression of particular views . . . on the subject." *Matal*, 137 S. Ct. at 1766 (2017) (Kennedy, J., concurring in part and concurring in the judgment) (citation omitted) (alteration in original). "At its most basic, the test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed." *Id.* "It is perhaps the most fundamental principle of First Amendment jurisprudence that the government may not regulate speech on the ground that it expresses a dissenting viewpoint." *Sanjour*, 56 F.3d at 96. The Act's prohibition of boycotts of Israel is quintessential viewpoint discrimination. *See, e.g., Sorrell*, 564 U.S. at 565 (law was content and viewpoint discriminatory where it targeted retailers who "convey messages that 'are often in conflict with the goals of the state'"); *see also Sanjour*, 56 F.3d at 96–97 (concluding that federal regulations prohibiting government employees from receiving reimbursement for unofficial speaking engagements were likely viewpoint discriminatory because it appeared that the government would not approve reimbursement for anti-government speech).

Indeed, this Court has previously addressed the constitutionality of a viewpoint-based condition imposed by the State of Arkansas on public employees and ruled against the state. *See,*

*e.g., Cooper v. Ross*, 472 F. Supp. 801, 809 (E.D. Ark. 1979). *Cooper* involved an assistant

professor at the University of Arkansas at Little Rock who was a member of the Communist

Party. In 1973, twenty-three state legislators filed suit in state court against Cooper, Chancellor

Ross, and the Trustees of the University, to enjoin Cooper's further employment at the university

on the ground that he had violated Ark. Stat. Ann. §§ 41-4111 and 41-4113 (1964), which

provided: "No person who is a member of a Nazi, Fascist or Communist society, or any

organization affiliated with such societies, shall be eligible for employment by the State of

Arkansas, or by any department, agency, institution, or municipality thereof." Ross thereafter

brought suit under 42 U.S.C. § 1983 in the Eastern District of Arkansas seeking to maintain his

employment. In deciding the case, this Court stated, "The decision not to rehire may not,

however, be predicated on the teacher's exercise of constitutionally protected rights, particularly

the First and Fourteenth Amendment guarantees of freedom of speech and association. . . . Our

form of government is built on the premise that every citizen shall have the right to engage in

political expression and association." *Id.* at 810 (citing *Sweezy v. New Hampshire,* 354 U.S. 234,

250 (1957)). "It is now beyond question that mere association with or membership in a

communistic organization is protected activity for which a state may not impose civil disabilities

such as exclusion from state employment." *Id.* (citing *Baird v. State Bar,* 401 U.S. 1 (1971)). In

other words, the government cannot use its position as employer or contractor to impose an

unconstitutional condition, including any viewpoint-based one.

Moreover, any conceivable legitimate state interest in extracting such an ideological

pledge (and there can be none) is fatally undercut by the wholesale exemption from the Act for

any contractor willing to give the government a 20% discount. Whatever state interest might be

asserted, it cannot be significant if it vanishes completely upon a 20% discount. "Exemptions

from an otherwise legitimate regulation of a medium of speech may be noteworthy for a reason quite apart from the risks of viewpoint and content discrimination: They may diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Gilleo,* 512 U.S. 43, 52 (1994). And so it is here. *See Koontz*, 283 F. Supp. 3d at 1023 (finding that "[t]he authority the Kansas Law grants the Secretary of Administration to waive [a similar certification requirement] . . . undermines any rationale offered by defendant.").

Finally, even if the certification requirement could constitutionally be applied to some subset of government contractors, it is nonetheless facially invalid because it is overinclusive. "If the government has a substantial interest with respect to only a subcategory of the restricted speech, then its interest will not readily outweigh the burden imposed on the larger category of speech subject to regulation." *Sanjour*, 56 F.3d at 97. Thus, "[i]n performing the *Pickering* balance . . . the courts must consider whether the challenged statute or regulation is tailored to address the harm that the government allegedly aims to protect." *Id.* Here, even if there were some limited subset of government contractors whose boycott activity legitimately implicated state interests, that would not justify preventing a wide range of government contractors—including individual service providers, small businesses, social service agencies, and members of the press—from participating in protected political boycotts. See *id.* at 98 ("[W]e believe that the extraordinary reach of the challenged regulations places a heavy justificatory burden on the government—or put another way, the great quantity of speech affected by the regulatory scheme weighs heavily on the side of the employees."). Moreover, the Act is "overinclusive because it also bans political boycotts, which is impermissible." *Koontz*, 283 F. Supp. 3d at 1023.

## Injunctive Relief Should Extend to All Government Contractors

Given that the certification and pledge requirements of the Act facially violate the First Amendment, the appropriate remedy in this case is an injunction preventing Defendants from enforcing the requirement against all government contractors, not just Plaintiff.  A court may reach beyond the particular circumstances of a plaintiff if they satisfy the standard for a facial challenge. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). In the First Amendment context, in particular, this Court should recognize the significant public interest in upholding free speech principles, as the ongoing enforcement of this unconstitutional requirement infringes not only the free expression interests of Plaintiff, but also the interests of other people and entities subjected to the same restrictions.  However, if the Court concludes that facial relief is inappropriate at this stage, it should enjoin Defendants from enforcing the Act against Plaintiff. Plaintiff's refusal to sign the certification is fully protected by the First Amendment. Whatever interests Defendants may assert to defend the Act as a whole, there is simply no justification for forcing Plaintiff to choose between exercising its First Amendment rights and contracting with the state.

## Plaintiff And Others Will Suffer Irreparable Harm In The Absence of a Preliminary Injunction

Plaintiff, and other governmental contractors similarly situated, will suffer irreparable harm if a preliminary injunction is not granted because its First Amendment rights are being abridged. *Phelps-Roper v. Nixon,* 509 F.3d 480 (8th Cir. 2007). There is no remedy at law which can compensate for the loss of these protected free speech rights. *Nat'l People's Action v. Village of Wilmette,* 914 F.2d. 1008, 1013 (7th Cir. 1990).  Moreover, Plaintiff has lost advertising revenue (that it cannot recover in a court of law) due to the anti-boycott certification requirement and will continue to lose money in the future if the Act is not invalidated.

## The Balance between This Harm and the Injury that Granting
## the Injunction Will Inflict on Other Interested Parties

Here, the balance of equities tips decidedly in Plaintiff's favor. *Phelps-Roper v. Nixon,*

509 F.3d 480 (8th Cir. 2007). In the absence of a preliminary injunction, enforcement of

challenged provisions of the law will prevent Plaintiff from exercising its First Amendment

rights. On the other hand, if the Court grants a preliminary injunction, Defendants will suffer no

harm.

## The Public Interest is in Served by issuing an Injunction.

Finally, the grant of a preliminary injunction would serve the public interest.  It is

axiomatic that the public interest is served by upholding the Constitution and preventing the

enforcement of unconstitutional laws. *Phelps-Roper v. Nixon,* 509 F.3d 480 (8th Cir. 2007).

Because §25-1-503 is unconstitutional, the public interest will be served by an injunction against

its enforcement.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant its

motion for a preliminary injunction and enjoin Defendants from enforcing § 25-1-503 of the

challenged Act 710 during the pendency of this litigation.

 Dated:


                              Respectfully submitted,

                              Bettina E. Brownstein
                              Bettina E. Brownstein (85019)
                              Bettina E. Brownstein Law Firm
                              904 West Second St., Suite 2
                              Little Rock, Arkansas 72201
                              Tel: (501) 920-1764
                              Email:  bettinabrownstein@gmail.com

John L. Burnett
John L. Burnett  (77021 )
Lavey & Burnett
904 West Second St., Suite 2
Little Rock, Arkansas 72201
Tel:  (501) 376-2269
Email:  jburnett@laveyburnett.com

*On Behalf of the Arkansas Civil Liberties Union
Foundation, Inc.*

Brian Hauss*
Vera Eidelman*
ACLU Foundation
Speech, Privacy & Technology Project
125 Broad St., 18th Floor
New York, NY 10004
Tel:  (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org


Attorneys for Plaintiff

*Pro hac vice* applications to be filed