**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS**

**ARKANSAS TIMES LP**                                                    **PLAINTIFF**

    **v.**                              **Case No. 4:18CV00914 BSM**

**MARK WALDRIP, JOHN GOODSON,
MORRIL HARRIMAN, KELLY EICHLER,
DAVID PRYOR, STEPHEN BROUGHTON,
C.C. GIBSON, SHEFFIELD NELSON,
TOMMY BOYER, and STEVE COX, in their
official capacities as Trustees of the University of
Arkansas Board of Trustees**                                      **DEFENDANTS**

<u>**BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PRELIMINARY INJUNCTION**</u>

Plaintiff challenges an Arkansas law prohibiting state entities from contracting on ordinary terms with companies that boycott Israel.  And to make that prohibition effective, the law requires entities to certify that they are not currently boycotting and do not intend to boycott Israel for the length of the contract.

Plaintiff—a free weekly paper—has never boycotted Israel and does not claim that it e*ver* intends to (or has so much as even contemplated boycotting Israel).  Thus, as relevant here, the challenged provision merely required Plaintiff to execute a truthful certification that it is not currently boycotting Israel and will not do so for the contract's duration.  Rather than make a truthful certification, Plaintiff brought this lawsuit challenging a law that has been in effect— without issue—for over a year.

Plaintiff's First Amendment challenge is unlikely to succeed on the merits because Plaintiff lacks standing to pursue one of its First Amendment theories, and because boycotting Israel, as defined by Arkansas law, is not protected First Amendment activity.  Furthermore,

Plaintiff has failed to show it will suffer irreparable harm absent an injunction, because Plaintiff will suffer—at most—only monetary damages.  Plaintiff's motion should, therefore, be denied.

## Facts and Procedural Background

On August 1, 2017, when Act 710 went into effect, Arkansas became the twenty-sixth state to prohibit public contracting on ordinary terms with companies that boycott Israel or to prohibit public investment in companies that boycott Israel.[1]  *See* Ark. Code Ann. §§ 25-1-501–04.  That Act both prohibits public investments in companies that boycott Israel, *see* Ark. Code Ann. § 25-1-504, and prohibits public contracting on ordinary terms with companies that boycott Israel.  *See* Ark. Code Ann. § 25-1-503.  Specifically, the contracting prohibition bars public entities from contracting with a company unless that company either (1) certifies that it is not currently engaged in a boycott of Israel and will not boycott Israel for the duration of the contract, or (2) agrees to contract at a price twenty percent cheaper than that of the cheapest

---

[1] *See* Ala. Code § 41-16-5 (prohibiting public contracting at regular prices with companies that boycott any nation, including Israel, that is a member of the World Trade Organization or with which the United States has free trade agreements); Ariz. Rev. Stat. § 35.393.01 (prohibiting public contracting with companies that boycott Israel); Cal. Pub. Cont. Code § 2010 (prohibiting public contracting with companies that fail to certify that "any policy that they have against any sovereign nation or peoples recognized by the government of the United States, including, but not limited to, the nation and people of Israel, is not used to discriminate in violation of [state civil rights law]"); Colo. Rev. Stat. § 24.54.8-202 (prohibiting state employee retirement fund investment in companies that have "economic prohibitions against Israel"); Fla. Stat. § 215.4725 (prohibiting state investment in companies that boycott Israel); Fla. Stat. § 287.135 (prohibiting public contracting with companies that boycott Israel); Ga. Code Ann. § 50-5-85 (same); Ill. Comp. Stat. Ann. § 5/1-110.16 (prohibiting state employee retirement fund investment in companies that boycott Israel); Ind. Code § 5-10.2-11-16 (same); Iowa Code §§ 12J.2, 12J.4 (same); Iowa Code §§ 12J.2, 12J.6 (prohibiting public contracting with companies that boycott Israel); Kan. Stat. Ann. § 75-3740f (same); Exec Order No. 2018-905 (Ky. Nov. 15, 2018) (same); Exec. Order No. JBE 2018 – 15 (La. May 22, 2018) (same); Exec. Order No. 01.01.2017.25 (Md. Oct. 23, 2017) (same); Mich. Comp. Laws Ann. § 18-1261 (same); Minn. Stat. Ann. §§ 3.226, 16C.053 (same); Nev. Rev. Stat. Ann. § 333.338 (same); Nev. Rev. Stat. Ann. §§ 355.330, 355.345 (prohibiting state investment in companies that boycott Israel); N.J. Stat. Ann. § 52:18A-89.14 (same); Exec. Order No. 157 (N.Y. June 5, 2016) (same); N.C. Gen. Stat. Ann. § 147-86.81 (same); N.C. Gen. Stat. Ann. § 147-86.82 (prohibiting public contracting with companies that boycott Israel); Ohio Rev. Code Ann. § 9.76 (prohibiting public contracting with companies that boycott any nation, including Israel, that is a member of the World Trade Organization or with which the United States has free trade agreements); 62 Pa. Cons. Stat. Ann. §§ 3602, 3604 (prohibiting public contracting with companies that boycott nations with which Pennsylvania is not prohibited by federal law from trading with, and declaring that the purpose of this enactment is "stand[ing] with Israel"); R.I. Gen. Laws §§ 37-2.6-3–4 (prohibiting public contracting on ordinary terms with companies that boycott nations with which the state can enjoy open trade); S.C. Code Ann. § 11-35-5300 (same); Tex. Gov't Code Ann. §§ 808.051–57 (prohibiting state investment in companies that boycott Israel); Tex. Gov't Code Ann. § 2270.002 (prohibiting public contracting with companies that boycott Israel); Exec. Order No. 261 (Wis. Oct. 27, 2017) (same).

business that does make the certification.   *See id.*   The Act defines "boycott of Israel" as "engaging in refusals to deal, terminating business activities, or other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner."   Ark. Code Ann. § 25-1-502(1)(A)(i).   Until this action, no contractor challenged the Act's contracting provisions, and there was no documented case of a contractor refusing to make the requisite certification.

In October 2018, fourteen months after the Act went into effect, the plaintiff—Arkansas Times LP, a limited partnership that publishes the *Arkansas Times*, a free alternative newsweekly, Doc. 1 at 2 ¶ 3—was negotiating advertising contracts with the University of Arkansas Pulaski Technical College (the "College").   *Id.* at 5 ¶ 21.   By that date, Plaintiff and the College had already executed twenty-five contracts in 2018 alone, following the thirty-six they executed in 2017.   *Id.* at 5 ¶ 20.   Plaintiff alleges that each of these sixty-one contracts were "executed . . . prior to the requirement of the boycott pledge in issue." *Id.*   But as Plaintiff also (and more accurately) alleges, the "boycott pledge" became a statutory requirement in August 2017, *id.* at 3 ¶ 15, and Plaintiff had, before the filing of this lawsuit, "published articles that [we]re critical of the Act[.]"   *Id.* at 6 ¶ 22.   Indeed, on August 30, September 1, and October 1, 2018, Plaintiff published a series of blog posts urging a "willing plaintiff" to challenge the Act and retain Plaintiff's current counsel in doing so, until it finally decided to challenge the Act itself after failing to rustle up anyone else who would.[2]

---

[2] Max Brantley, *Arizona judge blocks Israel boycott law. Arkansas, anyone?*, Arkansas Times: Arkansas Blog (Oct. 1, 2018), https://www.arktimes.com/ArkansasBlog/archives/2018/10/01/arizona-judge-blocks-israel-boycott-law-arkansas-anyone ("Care to join a push for free speech?  The ACLU of Arkansas can help."); *see also* Max Brantley, *Growing free speech concern on Israel boycott law*, Arkansas Times: Arkansas Blog (Aug. 30, 2018), https://www.arktimes.com/ArkansasBlog/archives/2018/08/30/growing-free-speech-concern-on-israel-boycott-law ("A lawsuit similar to the one filed in Kansas should be possible in Arkansas. . . . All that's needed is a plaintiff being forced to sign such a contract who'd like to object."); Lindsey Millar, *Wanna work for the state AND boycott Israel?*, Arkansas Times: Arkansas Blog (Sept. 1, 2018), https://www.arktimes.com/ArkansasBlog/archives/2018/09/01/wanna-work-for-the-state-and-boycott-israel (sharing

Notwithstanding that the Act governed *dozens* of Plaintiff's prior contracts with the College, in October Plaintiff suddenly balked at certifying that it would not boycott Israel for the duration of the short-term advertising contracts it was then negotiating with the College.  Doc. 1 at 6 ¶ 23.  By Plaintiff's own allegations and statements, such a certification would merely state the truth.  Plaintiff itself alleges that it "does not currently engage in a boycott of Israel or Israel-occupied territories."  *Id.* at 6 ¶ 22.  Plaintiff further posted on its website—the day it filed this action—that it has "*never* participated in a boycott of Israel or editorialized in support of one." Lindsey Millar, *Arkansas Times challenges law that requires state contractors to pledge not to boycott Israel in federal court*, Arkansas Times: Arkansas Blog (Dec. 11, 2018), https://www.arktimes.com/ArkansasBlog/archives/2018/12/11/arkansas-times-challenges-law-that-requires-state-contractors-to-pledge-not-to-boycott-israel-in-federal-court (emphasis added). The only Israel-boycott-related activity Plaintiff alleges it has engaged in is criticizing *the Act itself* in the blog posts cited above, *see* Doc. 1 at 6 ¶ 22—an activity which it does not even attempt to suggest falls within the Act's definition of boycotting Israel.

Nevertheless, Plaintiff refused to certify, in its October contracts with the College, that it was not currently boycotting Israel and would not boycott Israel for the duration of those short-term contracts.  Although such a certification would, by Plaintiff's own admission, have been accurate, Plaintiff's publisher's litigation "position" is that boycotting Israel is protected speech and that "it is unacceptable for Plaintiff to enter into an advertising contract . . . that is conditioned on the unconstitutional suppression of protected speech[.]"  *Id.* at 6 ¶ 23.  Plaintiff also refuses to avoid the certification requirement by selling its advertising to the College at a twenty percent discount.  *Id.* at 7 ¶ 28.  As a result of its refusals comply with the Act's

---

"PSA" from ACLU of Arkansas that the ACLU of Arkansas "welcome[d] anyone contracting with the state or local government . . . to get in touch with us").

provisions, Plaintiff alleges that it lost two advertising contracts with the College and that it anticipates losing more. *Id.* at 7 ¶ 27. That, Plaintiff alleges, led it to file this action against the Trustees of the University of Arkansas, of which the College is a part, seeking a declaratory judgment that the Act's contracting provisions violate the First Amendment, both facially and as applied to the Plaintiff, *id.* at 9, and an injunction barring the Trustees from requiring those contracting with the University of Arkansas to certify that they will not boycott Israel for the duration of their contracts with the University. *Id.*; Doc. 2 at 1. Alternatively, Plaintiff seeks an injunction against the Trustees to prevent them from requiring Plaintiff to make that certification. Doc. 1 at 9.

## Standard of Review

The standard of review of a motion for a preliminary injunction is a balancing of the following four factors: likelihood of success on the merits, the threat of irreparable harm to the movant, the balance between that harm and the harm that granting the injunction would cause defendants, and the public interest. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). However, "in a case such as this one, where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, [the court] must . . . make a threshold finding that [the movant] is likely to prevail on the merits." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc) (footnote omitted). Further, in this context, "likely" does not merely mean "a fair chance of prevailing on the merits, with a fair chance meaning something less than 50 percent." *Id.* at 730 (internal quotation marks omitted). Rather, the movant must prove that it is more likely than not to prevail on the merits before a court may grant relief, *see id.* at 731–32, though courts remain free to *deny* a motion solely on the basis of a lack of irreparable harm, without reaching the merits. *See id.* at 732 n.5

("[I]n some cases, lack of irreparable injury is the factor that should begin and end the *Dataphase* analysis.  In this respect, where a duly enacted statute is involved, a likelihood of success on the merits may be characterized as one, but not the only, threshold showing that must be met by a movant for a preliminary injunction.") (citation omitted).

## Argument

### I.      Plaintiff is unlikely to succeed on the merits of its First Amendment claim.

In its brief in support of its preliminary injunction motion, Plaintiff erroneously contends that it is likely to prevail on two independent First Amendment theories.  *See* Doc. 3 at 7.  First, Plaintiff claims that the Act compels speech regarding whether public contractors will boycott Israel, which, it says, is tantamount to "compel[ling] speech regarding contractors' political beliefs, association, and expression."  *Id.*  Second, Plaintiff claims that the Act "restricts state contractors from engaging in protected expression and association, including both boycott participation and boycott-related speech[.]"  *Id.*  Plaintiff is unlikely to succeed on the merits of either of these claims.  As a threshold matter, it lacks standing to pursue its boycott-restriction theory.  Beyond standing both claims fail on their merits because boycotting Israel is not protected by the First Amendment.

   A.      Plaintiff lacks standing to challenge the Act's prohibition of public contractors boycotting Israel.

"Standing is always a 'threshold question' in determining whether a court may hear a case." *281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (quoting *Eckles v. City of Corydon*, 341 F.3d 762, 767 (8th Cir. 2003)).  To establish standing, a plaintiff must establish three elements:  an injury in fact, traceability of that injury to the conduct of which the plaintiff complains, and redressability of the injury by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Here, Plaintiff has no standing to claim that the Act

unconstitutionally restricts public contractors from boycotting Israel because Plaintiff has not alleged that *it* intends to boycott Israel or has refrained from Israel boycotting that it would have engaged in but for the Act.

"In the First Amendment context, 'two types of injuries may confer Article III standing to seek prospective relief.'" *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016) (quoting *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003)). The first requires "alleging an intention to engage in a course of conduct . . . proscribed by a statute," such that the plaintiff faces a risk of prosecution or some other sanction, such as the loss of government employment, funding, or a government contract. *Id.* (internal quotation marks omitted) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "Second, [a plaintiff] can establish standing by alleging that it self-censored." *Id.* To show self-censorship, a plaintiff "needs . . . to establish that he would *like to* engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute." *281 Care Comm.*, 638 F.3d at 627 (emphasis added). The plaintiff must also show that its "decision to chill [its] speech in light of the challenged statute was 'objectively reasonable,'" *id.* (quoting *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009)), and will therefore fail to show standing if its self-censorship is based on an unreasonable reading of the statute, however sincerely held. *See Zanders*, 573 F.3d at 594–95. In short, to challenge a speech prohibition a plaintiff must allege that it either intends to engage in, or wants to engage in but has for fear of being penalized declined to engage in, the sort of speech that is prohibited.

Applying this rule here, Plaintiff does not have standing to make its boycott-prohibition claim, because it has not alleged that it intends to boycott, or that it wants to boycott and has censored itself from doing so in order to avoid losing contracts. While Plaintiff has refused to

comply with the Act, Plaintiff does not allege that it has violated the Act by *boycotting Israel*, nor that it intends to do so in the future—nor even that it has ever contemplated boycotting Israel.  Indeed, Plaintiff forthrightly alleges, and publicly states, that it has *never* boycotted Israel.  The only remotely boycotting-related activity or speech in which Plaintiff alleges it has engaged is criticism of *the Act's prohibition of boycotting*—not even advocacy of boycotting itself.  Plaintiff does not attempt to argue that it believes criticism of the Act is itself a boycott of Israel within the Act's definition.  Any belief to that effect would be utterly unreasonable.[3] Neither has Plaintiff self-censored in order to comply with the Act and continue contracting with the College; rather, it has refused to comply with the Act whatsoever and alleges it has lost contracts as a result.  Thus, Plaintiff does not allege that it has refrained from boycotting Israel in order to contract with the College and would boycott Israel but for the Act.

Because Plaintiff neither alleges that it intends to boycott Israel, nor that it would like to and has only refrained from boycotting Israel to comply with the Act, Plaintiff has no standing to challenge the Act's prohibition of boycotting Israel.  In challenging that prohibition, Plaintiff is "simply attempting to obtain an advisory opinion or to enlist the court in a general effort to purge the [Arkansas] statute books of unconstitutional legislation."  *United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 430 (8th Cir. 1988).  This Court has no jurisdiction to render advisory opinions or engage in such purges; its jurisdiction is

---

[3] The Act's definition of a boycott of Israel, at its broadest, embraces "other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner."  Ark. Code Ann. § 25-1-502(1)(A)(i).  First, both constitutional avoidance, and the canon providing that general terms in a list are read in the context of specific terms in that list, which Arkansas courts follow, *see Edwards v. Campbell*, 370 S.W.2d 250, 253 (Ark. 2010), would counsel in favor of reading "other actions" to only cover conduct, not pure speech, like the other items listed in the definition of Israel boycotting.  *See* Ark. Code Ann. § 25-1-502(1)(A)(i) (providing that "refusals to deal [or] terminating business activities" with the requisite purpose count as boycotts of Israel).  Second, criticism of the Act, such as that engaged in by Plaintiff, is not necessarily or likely "intended to limit commercial relations with Israel."  Rather, Plaintiff's published criticisms of the Act are motivated by concerns about its constitutionality—the same abstract concerns that motivated Plaintiff to bring this action even though it does not actively support boycotts of Israel.

constitutionally limited to adjudicating actual cases and controversies. *See Lujan*, 504 U.S. at 559. Therefore, in order for Plaintiff to show that it is likely to succeed on the merits of its claims, it must show that it is likely to succeed on its compelled-speech theory; it cannot succeed on the merits of its First Amendment claim by prevailing on its boycott-prohibition theory.

Notably, the plaintiffs in both of the Israel boycotting district court cases on which Plaintiff relies so heavily were actually engaged in boycotts of Israel. *See Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, slip op. at 9–10 (D. Ariz. Sept. 27, 2018), appeal filed, No. 18-16896 (9th Cir. Oct. 3, 2018) (finding that the solo practitioner who owned and operated the plaintiff law firm refused to purchase products of several companies because those companies did business in Israel-controlled territories); *id.* at 9 (finding that but for Arizona's Israel boycotting law, the practitioner would have extended his boycotting to his firm's purchasing decisions); *Koontz v. Watson*, 283 F. Supp. 3d 1007, 1013 (D. Kan. 2018) ("In May 2017, plaintiff Esther Koontz [a contractor] began boycotting Israeli businesses."). Even so, standing was a hotly contested issue in *Jordahl*. *See Jordahl*, slip op. at 7–10. Whereas here, Plaintiff has never boycotted Israel or expressed any desire to do so, Plaintiff clearly lacks standing to pursue its compelled-speech theory.

B.    Boycotting Israel is not protected by the First Amendment.

1.    Whether boycotting is protected by the First Amendment is a threshold question under both of Plaintiff's First Amendment theories.

The First Amendment only protects speech or "conduct that is inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006). To prevail on its First Amendment claim, Plaintiff must show that boycotting Israeli products is either speech or inherently expressive conduct. This is true even of Plaintiffs' compelled-speech theory.

Whether the Act's requirement that public contractors certify that they will not boycott Israel unconstitutionally compels speech turns, under Plaintiff's own argument, on whether boycotting Israel is itself protected by the First Amendment. That is because Plaintiff does not argue that contracting-certification requirements generally compel speech in a constitutionally problematic way; instead, Plaintiff only argues that requiring contractors to certify that they will not engage in protected First Amendment activity unconstitutionally compels speech. For example, Plaintiff's compelled-speech argument does not suggest that a statute requiring public contractors to certify that they are equal-opportunity employers unconstitutionally compels contractors to espouse a message of equal-opportunity employment, or that a statute requiring applicants for public employment to certify that they are not felons unconstitutionally compels those applicants to espouse a message of non-felony. An argument to that effect would border on frivolous. *See, e.g.*, *Grove City Coll. v. Bell*, 465 U.S. 555, 575 (1984) (stating that a First Amendment challenge to a requirement that recipients of federal funding certify they did not discriminate on the basis of sex "warrant[ed] only brief consideration"). Certification requirements are not "compulsion[s] to disseminate a particular political or ideological message," *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995), as laws that unconstitutionally compel speech generally are, *see id.*, but rather, require contractors "only to provide the government with information" about whether they meet government contracting requirements. *Id.* Requirements "to provide the government with information" do not generally implicate compelled-speech concerns. *Id.*

Rather, in claiming that the Act's certification requirement unconstitutionally compels speech, Plaintiff relies on a series of cases about oaths—many involving requirements that applicants for some government benefit swear that they had never been a member of the

Communist Party or like organizations—that held that government employment and other benefits "'may not be conditioned on an oath that one has not engaged, or will not engage[], in protected speech activities' or 'associational activities within constitutional protection'" under the First Amendment freedom of association. Doc. 3 at 10 (quoting *Cole v. Richardson*, 405 U.S. 676, 680 (1972)).  To fall afoul of this niche rule of compelled-speech doctrine, a certification requirement must require contractors to certify that they do not and will not engage in some protected speech, expressive conduct, or protected associational activity (*e.g.*, political party membership).  Thus, whether under Plaintiff's theory that the Act unconstitutionally prohibits Israel boycotting, or under its theory that it unconstitutionally compels certifications not to boycott Israel, Plaintiff can only succeed if boycotting Israel is itself protected by the First Amendment.

       2.     Boycotting Israel is not protected speech, expressive conduct, or associational activity.

The mere conduct of boycotting Israel is not protected by the First Amendment.  It is neither speech, nor is it conduct that is inherently expressive, nor associational activity that is afforded constitutional protection.

The *act* of refusing to buy a product because of the activities or residence of its maker is neither speech nor inherently expressive conduct, no more so than the act of refusing to buy a product simply because one does not like it.  Rather, such acts are pure conduct that is merely *motivated* by beliefs that can take protected form.  *See, e.g.*, *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 634 (1984) ("The Constitution does not guarantee a right to choose employees, customers, *suppliers, or those with whom one engages in simple commercial transactions,* without restraint from the State.  A shopkeeper has

no constitutional right to deal only with persons of one sex.") (O'Connor, J., concurring in part and concurring in the judgment) (emphasis added).

Boycotting is plainly not *speech*.  Whatever speech may accompany boycotting, the act of boycotting itself does not communicate through words or any other inherently expressive medium.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (discussing a variety of "mediums of expression" that are protected speech, such as painting, music, marches, and parades).  Boycotters boycott simply by refusing to buy things, often without any accompanying speech at all.  *See Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, slip op. at 10 (D. Ariz. Sept. 27, 2018), appeal filed, No. 18-16896 (9th Cir. Oct. 3, 2018) (discussing plaintiff's allegations that he boycotted Israel by declining to personally purchase Sodastream home carbonation machines and Hewlett-Packard printers).

Boycotting is also not "inherently expressive" conduct.  *FAIR*, 547 U.S. at 66.  We know this because the Supreme Court has held it.  In *FAIR*, "law schools 'expressed' their disagreement with the military['s]" policy of Don't Ask, Don't Tell by denying military recruiters access to their campuses.  *Id.*  The coalition of law schools that engaged in this conduct aptly described this refusal to deal with the military, in their Supreme Court brief, as "a limited sort of boycott," and argued for its First Amendment protection in those terms.  Brief of Respondents, *FAIR*, 2005 WL 2347175 at *29.  Congress responded to this "sort of boycott" by denying federal funding to institutions that engaged in it.  *FAIR*, 547 U.S. at 51.

Reviewing this funding condition, the Court held that the First Amendment would not prohibit a federal ban of discrimination against military recruiters altogether.  *See id.* at 60.  The Court explained, in part, that the law schools' boycott was "not inherently expressive."  *Id.* at 66. The Court reasoned that the act of excluding military recruiters from law school campuses and

requiring them to conduct interviews at off-campus locations—a far more visible act than a passive refusal to purchase Israeli products—was "expressive only because the law schools accompanied their conduct with speech explaining it." *Id.* "An observer who s[aw] military recruiters interviewing away from the law school" would have "no way of knowing" why they were interviewing off-campus absent explanatory speech. *Id.* And explanatory speech, the Court held, would not suffice to transform the law schools' unexpressive conduct into protected expression; "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

All this reasoning applies with much greater force to a boycott of Israeli goods. In the first place, it is highly unlikely that an observer would ever notice, absent explanatory speech apart from the boycott itself, that a contractor declined to purchase Israeli goods. Few people know which goods are Israeli, much less which goods are manufactured by companies that do business in Israel; fewer people still would keep track of which brand of printer or soda-carbonation machine a company buys. *See Jordahl*, slip op. at 10 (noting that a lawyer intent on boycotting Israel and Israel-affiliated companies only modified his purchasing decisions insofar as he declined to purchase Hewlett-Packard printers, Sodastream soda machines, and overnight stays from Airbnb, because those companies did business in Israel). Still fewer people are likely to note the *absence* of certain companies' goods from a contractor's offices or operations. *Cf. FAIR*, 547 U.S. at 66 (acknowledging that observers might at least notice legal military recruiters' *presence* and interviewing *activity* at unusual off-campus locations, such as undergraduate campuses associated with a boycotting law school).

If an observer did connect the dots between the absent Hewlett-Packard printers and other Israel-affiliated goods, he would be left to guess whether coincidence, a preference for American

products, an opposition to Israel, or any one of a large number of political views was the reason for the inconspicuous absence of Israeli goods.  In the vast majority of cases, only explanatory speech would shed light on the fact that the boycotter was boycotting Israel at all, and express why the boycotter was doing so.  *See Jordahl v. Brnovich*, No 18-16896, Doc. 26 at 5 (9th Cir. Oct. 31, 2018) (Ikuta, J., dissenting from denial of stay pending appeal) ("Until Jordahl explains that he is engaged in a boycott [of Israel], his private purchasing decisions do not communicate his opinions to the public.").  But as *FAIR* holds, the fact that conduct can be *explained* by speech to spring from some political belief does not transform the conduct into an expression of that belief.  What expresses the belief is the explanatory speech.  And because the relationship between the belief and the conduct must be explained, by definition, the conduct does not express that belief.

Plaintiff may argue that *FAIR* was not about boycotting, even though the coalition of law schools described its protest of the military as a boycott in its briefing.  Even if *FAIR* were not about boycotting, it is impossible to see, for the reasons given above, how the highly visible and widely publicized protest in *FAIR* could somehow be *less* inherently expressive than a contractor's private choices not to purchase Israeli and Israel-affiliated goods.  Whether conduct is inherently expressive largely turns on whether it conveys a message without the help of explanatory speech.  S*ee FAIR*, 547 U.S. at 66 ("The fact that . . . explanatory speech is necessary is strong evidence that . . . conduct . . . is not so inherently expressive that it warrants protection").  And a series of largely unnoticed purchasing choices does not, in the mine-run of cases, convey any message without that help.  But *FAIR* is not the only place that the Supreme Court has held that boycotting itself, apart from the speech that may accompany it, is not inherently expressive.

Most *a propos* to this case, in *International Longshoremen's Ass'n v. Allied International, Inc.*, 456 U.S. 212 (1982), the Supreme Court held that a union's "boycott" of Soviet goods, *id.* at 214, taken "to protest the Russian investigation of Afghanistan," *id.*, was not protected by the First Amendment. *See id.* at 226–27. Specifically, the longshoremen's union at issue there refused to unload cargoes shipped from the Soviet Union, *id.* at 214, forcing importers to import goods from elsewhere. *See id.* at 215–16. The Court first held that the union's boycott was an illegal secondary boycott under the National Labor Relations Act, *see id.* at 218–26, *i.e.*, a boycott intended to force others to cease trading in Soviet goods. The Court then summarily rejected the union's First Amendment defense, reasoning that it had "consistently rejected the claim that secondary picketing by labor unions . . . is protected activity under the First Amendment," *id.* at 226, and that "[i]t seems still clearer that conduct not designed to communicate but to coerce merits still less consideration under the First Amendment." *Id.* The Court then quoted a passage from one of its secondary picketing opinions explaining that secondary-picketing bans permissibly "affect[] only that aspect of [a] union's efforts to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea[.]" *Id.* at 226 n.26 (internal quotation marks omitted) (quoting *NLRB v. Retail Store Emps. Union, Local 1001*, 447 U.S. 607, 619 (1980) (Stevens, J., concurring in part and concurring in the result)). Finally, the Court observed that "[t]here are many ways in which a union and its individual members may express their opposition to Russian foreign policy without infringing upon the rights of others." *Id.* at 227.

The public-contractor boycotts of Israel that the Act prohibits are materially identical, for First Amendment purposes, to the boycott the Court held was plainly unprotected by the First Amendment in *Longshoremen's*. Like the *Longshoremen's* boycott, the purpose of anti-Israel

boycotts is to coerce others to change their behavior.  The ultimate goal of anti-Israel boycotts is to coerce Israel to change policies that the  boycotters find objectionable.  *See* Palestinian BDS National Committee, *What is BDS?*, https://bdsmovement.net/what-is-bds (explaining that the Boycott, Divestment, Sanctions (BDS) movement "urges action to pressure Israel").   But the intermediate goal of such boycotts is to coerce businesses to stop doing business with or in Israel.   *See*   Palestinian   BDS   National   Committee,   *Economic   Boycott*, https://bdsmovement.net/economic-boycott (boasting  that  the  BDS  movement's  economic boycotting has been a "key factor" in a sharp decline in foreign investment in Israel, has caused major companies to "exit[] the Israeli market," pushed Israel's largest agricultural exporter into bankruptcy by "push[ing]" Israeli farmers to export their produce through different exporters, and "forced" other companies to close their operations in what the movement labels Palestinian territory).   This  kind  of  coercion  is  not  protected  by  the  First  Amendment.   As  in *Longshoremen's*, people  and  businesses  who  oppose  Israel  have  any  number  of  ways  of expressing their opposition without coercing others.

Notwithstanding *Fair* and *Longshoremen's*, cases that held the First Amendment did not protect politically motivated boycotts, Plaintiff argues "the First Amendment protects the right to engage  in  politically-motivated  boycotts,"  Doc.  3  at  7.   But  this  argument  rests  entirely  on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).  *See* Doc. 3 at 7–9 (discussing only *Claiborne Hardware* and cases that "reaffirmed" it by distinguishing it in support of its argument that the First Amendment protects politically motivated boycotts).[4]  Decided the same year as *Longshoremen's*,  and  twenty-four  years  before  *FAIR*,  *Claiborne  Hardware*  is  eminently distinguishable from this case in two critical respects.  First, boycotts of Israel do not implicate

---

[4] *See FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 425–28 (1990) (limiting *Claiborne Hardware* to its facts); *Allied  Tube  &  Conduit  Corp.  v.  Indian  Head,  Inc.*, 486  U.S.  492,  508  (1988)  (distinguishing *Claiborne Hardware*).

the right to petition.  Second, *Claiborne Hardware* did not hold that boycotting itself is protected by the First Amendment.

In 1965, Charles Evers organized the Claiborne County Branch of the NAACP in Claiborne County, Mississippi.  *See Claiborne Hardware*, 458 U.S. at 898.  The local chapter of the NAACP that Evers organized petitioned public officials to desegregate.  *See id.* at 899.  The petition did not meet with a favorable response, and the local NAACP consequently voted unanimously to boycott white business.  *See id.* at 900.  In response, white merchants sued the NAACP and black citizens who participated in the boycott.  *See id.* at 889–90.  The state courts found the defendants liable for malicious interference with the plaintiffs' businesses, *see id.* at 891, and concluded that the boycott and the speech encouraging it were unprotected by the First Amendment.  *See id.* at 895.

The Supreme Court reversed.  The Court began its analysis of whether the defendants' activities were protected by the First Amendment by observing that the "boycott . . . took many forms."  *Id.* at 907.  First, the Court observed, "[t]he boycott was launched at a meeting . . . attended by several hundred persons."  *Id.*  Second, its purpose was to "secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice."  *Id.*  Third, it was "supported by speeches and nonviolent picketing."  And fourth, "[p]articipants repeatedly encouraged others to join in its cause."  *Id.*  The Court explained that "[e]ach of *these elements* of the boycott"—public meetings, lists of demands, speeches, nonviolent picketing, encouraging others to join—"is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments."  *Id.* (emphasis added).  The Court proceeded to explain why each of these elements of the boycott was protected.  It explained that under settled doctrine the First Amendment protected the freedom of association and peaceable

assembly, *see id.* at 908–09, that it protected the boycotters' "peaceful picketing," *id.* at 909, that it protected the boycotters' "public address" promoting the boycott and "personal solicitation" encouraging others to join, *id.*, and that it even protected the boycotters "'threat[s]' of social ostracism," inasmuch as those threats were expressed in speech. *Id.* at 910.

"In sum," the Court concluded, "the boycott clearly *involved* constitutionally protected activity"—namely, the "elements of speech, assembly, association, and petition" that accompanied the boycott itself. *Id.* at 911 (emphasis added). Nowhere in its opinion did the Court say that the *act of refusing to buy* from white merchants itself was protected by the First Amendment. Rather, what the Court held protected were the boycotters' list of demands, the meetings they held to organize the boycott, and the speech they made to promote it—speech for which Evers and his cohorts were specifically held liable by the state courts. *See id.* at 902, 906, 926–29 (discussing the state trial court's reliance on Evers's speeches).

Critically, however, the Court's analysis did not stop there. Even though the state courts had imposed liability on the defendants for pure First Amendment speech, assembly, and petition, the Court acknowledged that "[t]he presence of [this] protected activity . . . d[id] not end the relevant constitutional inquiry." *Id.* at 912. This was so because federal and state governments may regulate even "nonviolent and totally voluntary boycotts [that] have a disruptive effect on local economic conditions," or, under cases like *Longshoremen's*, "may . . . prohibit[]" union "[s]econdary boycotts and picketing[.]" *Id.* (citing *Longshoremen's*, 456 U.S. at 222–23; *Retail Store Emps.*, 447 U.S. at 617–18).

The reason that the Court ultimately held that the defendants' boycotting activities overcame the Court's precedent permitting prohibitions of boycotting was that "a major purpose of the boycott in *this* case was to influence government action." *Id.* at 914 (emphasis added).

Analogizing from its *Noerr-Pennington* antitrust doctrine, under which anticompetitive conduct that is intended to influence legislation is (broadly speaking) immune from antitrust liability on the theory that holding people liable for such conduct would deny their First Amendment "right . . . to petition their representatives in government," *id.* at 913 (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 139–40 (1961)), the Court concluded that '[t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself." *Id.* at 914.

In suppor, the Court cited two cases—a Supreme Court opinion doubting the assumption that a boycott of segregated *city* buses intended to induce the city to desegregate them could be constitutionally prohibited, *id.* at 914 n.48 (citing *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 28, 307 (1964)), and an Eighth Circuit opinion that held that a feminist group's boycott of *states* that had not ratified the Equal Rights Amendment was protected by the First Amendment because "'the right to petition is of such importance that it is not an improper interference under state tort law even when exercised by way of a boycott.'" *Id.* (quoting *Missouri v. Nat'l Org. for Women, Inc.*, 620 F.2d 1301, 1317 (8th Cir. 1980)). Both of these cases, of course, involved boycotts intended to petition state governments to change their laws—something which the First Amendment explicitly and specifically protects. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging . . . the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."). Only after going through this petition-specific analysis did the Court finally "hold that the nonviolent elements of [the boycotters'] activities [we]re entitled to the protection of the First Amendment." *Claiborne Hardware*, 458 U.S. at 915.

Given this critical turn in the Court's opinion, lower courts—including the Eighth Circuit—have read *Claiborne Hardware* as merely extending the *Noerr-Pennington* doctrine's protection of government-petitioning anticompetitive conduct from antitrust liability to government-petitioning boycotts from liability under state law.   In *In re IBP Confidential Business Documents Litigation*, 755 F.2d 1300 (8th Cir. 1985), the Eighth Circuit wrote of *Claiborne Hardware* that "[c]ourts have indeed extended the [*Noerr-Pennington*] doctrine beyond the antitrust context to a limited extent.   For example, certain efforts to *influence the government* do not give rise to liability for tortious interference with business."   *Id.* at 1312 (emphasis added) (citing *Claiborne Hardware*, 458 U.S. at 915).   Other courts of appeals agree with the Eighth Circuit's reading of *Claiborne Hardware*.   *See Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159 (3d Cir. 2001); *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000) (en banc); *id.* at 895 (Lucero, J., dissenting); *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 298 (2d Cir. 1992).

Plaintiff's attempt to export the rule of *Claiborne Hardware* to the anti-Israel boycotting at issue here fails, then, on two levels.   The first is that boycotts of Israel do not implicate the right to petition.   The First Amendment protects the right to "petition the Government," not *other nations' governments*, and it was that right and that right alone that the *Claiborne Hardware* Court ultimately concluded overcame "[t]he right of the States to regulate boycotting activity[.]" *Claiborne Hardware*, 458 U.S. at 914.   Boycotts of Israel do not petition the federal government or the State of Arkansas; if they petition any government, it is the government of Israel.   More concretely, they petition private actors to stop doing business with Israel.   *Claiborne Hardware* ultimately stands for the proposition that "the right to petition is of such importance," *id.* at 914 n.48 (internal quotation marks omitted) (quoting *National Organization for Women*, 620 F.2d at

1317), that it supersedes "the strong governmental interest in . . . economic regulation[.]"  *Id.* at 912.   Boycotts intended to express disagreements with foreign nations do not, as *Longshoremen's* squarely held, overcome that powerful interest.

The second reason Plaintiff's attempt to export *Claiborne Hardware* to the circumstances of this case fails is that *Claiborne Hardware* did not hold that boycotting itself is protected. Rather, in reviewing a state-court judgment that held the NAACP and others liable for giving boycott-advocating speeches, encouraging others to participate with non-coercive threats of social ostracism, and gathering peaceably to make boycotting plans, the Court held that *these* forms of pure speech and protected association were protected by the First Amendment. Arkansas's law, unlike Mississippi's state-court judgment, does not sanction boycotting advocacy, or associating with boycott supporters; it only prohibits "actions" that boycott Israel, like "refusals to deal [and] terminating business activities[.]"   Ark. Code Ann. § 25-1-502(1)(A)(i).  Indeed, Arkansas public contractors, such as Plaintiff, are free to advocate others to boycott Israel as much as they want.

Notably, this reality about Arkansas's law not only distinguishes *Claiborne Hardware*, but the district court decision on which Plaintiff relies most heavily.  In *Jordahl*, an Arizona district court held that Arizona's prohibition on public contractors boycotting Israel was likely unconstitutional.  That decision is currently on appeal, and Defendants do not think it was correctly decided.  Yet in holding that Arizona's law was likely unconstitutional, the district court relied on features of Arizona's definition of Israel boycotting that, in the district court's view, limited prohibited boycotts to those, like the one in *Claiborne Hardware*, that were part of some collective, associative action.  Specifically, the district court relied on language in Arizona's Israel-boycotting definition that appeared to the district court to limit prohibited

boycotting to boycotts "*taken . . . in compliance with or adherence to calls for a boycott of Israel.*" *Jordahl*, slip op. at 22 (emphasis in original) (internal quotation marks omitted) (quoting Ariz. Rev. Stat. 35-393(1)(a)). According to the district court, such "collective" boycotts, which were all, in its view, that the statute prohibited, were protected by *Claiborne Hardware*, unlike the sort of boycott at issue in *FAIR*. *Id.* at 23. The district court "agree[d] [with Arizona] that the commercial actions (or non-actions) of one person, e.g., the decision not to buy a particular brand of printer to show support for a political position, may not be deserving of First Amendment protections on the grounds that such action is typically only expressive when explanatory speech accompanies it." *Id.*

Whether or not that district court correctly interpreted Arizona law, which is doubtful, *see* Ariz. Rev. Stat. § 35.393(1)(b) (adding that Israel-boycotting activities are, under Arizona's definition, also boycotts of Israel if they discriminate on the basis of nationality, national origin, or religion and lack a valid business purpose, whether or not they respond to calls for a boycott), or *Claiborne Hardware*, which is also doubtful, Arkansas's law plainly lacks the problematic and ultimately fatal feature the district court identified in Arizona's. Nothing about its definition of Israel boycotts limits Israel boycotts to collective ones, or ones taken in response to some protected boycott advocacy; rather, its definition embraces the purely individual actions that the *Jordahl* court agreed were likely unprotected. Under the *Jordahl* court's own reasoning, then, Arkansas's law is not invalid on its face, because it applies to an abundance of boycotts that the *Jordahl* court conceded states may constitutionally prohibit. Nor is it invalid as applied to Plaintiff because it has not alleged even an interest in participating in the sort of "collective" boycott that the *Jordahl* court understood *Claiborne Hardware* to exclusively protect.

Boycotting Israel, as defined under Arkansas law, is therefore not protected by the First Amendment.

3.    Because boycotting Israel is not protected by the First Amendment, both of Plaintiff's First Amendment theories fail.

Because boycotting Israel, as defined by the Act, is neither protected speech, nor inherently expressive conduct, nor associational activity, Plaintiff cannot prevail on either of its First Amendment theories.  Most obviously, even if it had standing to raise the theory, which it does not, Plaintiff cannot prevail on its theory that the Act unconstitutionally prohibits Israel boycotting if Israel boycotting is not constitutionally protected.  But Plaintiff also cannot succeed, for the same reason, on its theory that the certification requirement unconstitutionally compels speech.

As discussed above, *see* Section B.1, *supra*, the First Amendment does not, generally, prohibit certification requirements for obtaining some government benefit (such as government employment or government contracts) that merely elicit information about the applicant.  The one situation in which such certification requirements or mandated oaths do become constitutionally problematic is when the state requires applicants for government benefits to certify that they "will not engage . . . in protected speech activities," or "associational activities within constitutional protection."  *Cole v. Richardson*, 405 U.S. 676, 680 (1972).  Thus, the cases Plaintiff cites in support of its compelled-speech theory involved bar application questions on whether applicants had been members of the Communist Party, *see* Doc. 3 at 10 (citing *Baird v. State Bar of Arizona*, 401 U.S. 1, 4–5 (1971)), tax-form questions on whether applicants for tax exemptions supported foreign governments hostile to the United States, *id.* (citing *Speiser v.*

*Randall*, 357 U.S. 513, 514–15 (1958)),[5] mandatory oaths by state employees to oppose the overthrow of the federal or state governments, which the Court held constitutional, *see Cole*, 405 U.S. at 686–87, and terminations of state employees for supporting their superiors' political opponents. *See* Doc. 3 at 11 (citing *Jantzen v. Hawkins*, 188 F.3d 1247, 1251 (10th Cir. 1999)).

Boycotting Israel to influence Israel and private businesses who deal with Israel, as explained, is not protected speech, protected expressive conduct, or protected associational activity. Therefore, requiring government contractors to certify that they will not boycott Israel does not violate the First Amendment, as interpreted in the oath cases on which Plaintiff relies. Both of Plaintiffs' First Amendment theories are therefore likely to fail, and Plaintiff's motion for a preliminary injunction must be denied.

## II.       If preliminary relief is denied, Plaintiff will not suffer irreparable harm.

In addition to failing to show a likelihood of success on the merits, Plaintiff has failed to allege that it will suffer irreparable harm if a preliminary injunction is denied because the harm that it alleges is purely monetary.

"[T]emporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). The only injury that Plaintiff has alleged it has suffered or will suffer without a preliminary injunction is a "los[s] [of] advertising revenue[.]" Doc. 3 at 18. Plaintiff claims that it cannot recover this revenue in a court of law. *See id.* But Plaintiff does not explain why this is the case, and it is impossible to see why it would be. If Plaintiff ultimately prevailed on the merits and persuaded this Court that the Act is unconstitutional, it could recover such advertising revenues that it proved it lost as a result of the Act. Plaintiff has specifically alleged that, given its long history of selling

---

[5] In *Speiser*, the Court actually assumed that such questions did not violate the First Amendment, *see Speiser*, 357 U.S. at 519–20, and only held the questions violated due process by placing a burden of proof on the applicants for exemption. *See id.* at 521–29.

advertising space to the College, it would have executed two advertising contracts in October 2018 but for the Act's certification requirement; there is no reason why, were Plaintiff to succeed on the merits, it could not recover the revenue it would have received under those contracts, or why this Court could not estimate the number of contracts Plaintiff would have executed between itself and the College but for the Act, given the parties' prior business dealings.

Plaintiff relies on the Eighth Circuit's statement in *Phelps Roper v. Troutman*, 662 F.3d 485 (8th Cir. 2011), *overruled on other grounds*, 712 F.3d 712 (8th Cir. 2013), that "[w]hen a plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied," *id.* at 488, and its statement in *Phelps-Roper v. Nixon*, 509 F.3d 480 (8th Cir. 2007), that "a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 483 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). All of these statements trace back to *Elrod*. S*ee Troutman*, 662 F.3d at 488 (citing *Phelps-Roper v. Nixon*, 545 F.3d 685, 688 (8th Cir. 2008) (citing *Elrod*, 427 U.S. at 373))). *Elrod*, correctly understood, holds only that "First Amendment interests were either threatened or in fact being impaired at the time relief was sought," in the sense that the plaintiff is either being threatened with some sanction, or is self-censoring his speech, at the relevant time. *Elrod*, 427 U.S. at 373.

In *Elrod*, a class of Chicago sheriff employees who were required to join the sheriff's political party to keep their jobs sued. The district court denied preliminary relief because the plaintiffs had an adequate remedy at law, namely backpay. *See id.* at 373. The Court rejected this argument against irreparable harm because, "[a]t the time a preliminary injunction was sought in the District Court, one of the [plaintiffs] was only threatened with discharge," while

others "had agreed to provide support for the Democratic Party in order to avoid discharge." *Id.*
The Court said it was therefore "clear . . . that First Amendment interests were either threatened or in fact being impaired at the time relief was sought." *Id.* Rather than rejecting the district court's rationale that retrospective monetary injuries, in the form of politically motivated termination, could not support injunctive relief, the Court reasoned that injunctive relief was proper because some plaintiffs were still being put to the unconstitutional choice of self-censoring or losing their jobs at the time injunctive relief was sought, while others were actively self-censoring and suffering another kind of irreparable and intangible injury.

Where, by contrast, the First Amendment injury a plaintiff is suffering at the time he moves for injunctive relief is compensable monetary harm, courts read *Elrod* to preclude preliminary injunctive relief. In *National Treasury Employees Union v. United States*, 927 F.2d 1253 (D.C. Cir. 1991), the D.C. Circuit in an opinion by then-Judge Thomas held that a law forbidding federal employees from receiving honoraria for speeches or articles could not be enjoined on a preliminary basis, because plaintiffs' harms at the relevant time were only monetary. The statute did not prevent government employees from giving speeches, *see id.* at 1255; the only ostensibly irreparable harm plaintiffs could point to is that "if [the court did] not grant them preliminary relief, they will not be paid for speaking or writing before the district court rules on the merits." *Id.* at 1255–56. That harm, Justice Thomas reasoned, could be remedied at the conclusion of the case, and thus was not irreparable. *See id.* at 1256. As for *Elrod*, Justice Thomas explained that while the statute might violate the First Amendment, it was not presently threatening or impairing plaintiffs' First Amendment interests, as *Elrod* required; "[n]othing in the record convince[d] [him] that the [plaintiffs] will cease speaking or writing before the district court resolves their constitutional challenges." *Id.* at 1255. Other circuits read

*Elrod* the same way. *See, e.g.*, *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (holding that First Amendment plaintiffs must show that First Amendment interests are in fact being threatened or impaired at the time relief is sought, and that "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury"); *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 350 (2d Cir. 2003) (explaining that "in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff . . . must demonstrate that the injunction will prevent the feared deprivation of speech rights" and cannot rely on a presumption of irreparable harm).

Here, had Plaintiff chosen to certify that it would not boycott Israel, it could at least claim that it was suffering the irreparable harm of being coerced into the certification. If this Court held that such coercion likely violated the First Amendment, it could also conclude that Plaintiff's First Amendment interests were being impaired at the present time, in a manner that only preliminary relief could cure. But because Plaintiff opted not to certify, whatever First Amendment interests it has in boycotting Israel, and in not certifying, are neither being threatened nor impaired at the present time. They are not being impaired because Plaintiff, by its choice, remains free to boycott Israel, and to say whatever it wants about its intentions to boycott Israel. They are not being threatened because Plaintiff has already opted to accept the monetary costs of declining to certify that it will not boycott Israel, like the plaintiffs in *Elrod* who opted for being discharged rather than switching their party registration and who the Court implicitly concluded were not irreparably harmed, or like the plaintiffs in *National Treasury Employees Union* who chose to remain in government employment and lose honoraria for their speeches, and were therefore unable to show irreparable harm. Plaintiff's speech, by its own choice,

remains entirely untrammeled; all that it has lost and will lose during the pendency of this action are compensable advertising revenues, which are not irreparable as a matter of law. Plaintiff's motion must therefore be denied.

## III.     The balance of harms weighs in favor of the State.

If injunctive relief is denied, Plaintiff will suffer no irreparable harm whatsoever; the injury it will suffer during the pendency of this action is monetary and compensable. If injunctive relief is granted, however, the State will suffer irreparable harm. "'Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it has suffered a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (alteration omitted) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *accord Hand v. Scott*, 888 F.3d 1206, 1214 (11th Cir. 2018). The balance of equities thus weighs in favor of retaining the status quo and allowing the Act to remain in effect.

## IV.     If this Court grants injunctive relief, it should limit it to Plaintiff.

If this Court concludes that Plaintiff's First Amendment rights are likely violated by the Act, that it is suffering irreparable harm, and that it is entitled to injunctive relief, this Court should limit that relief to Plaintiff. Plaintiff simply has no standing, absent a class certification order, to litigate on behalf of others or obtain injunctive relief on behalf of others. Even if this Court concludes that the Act is likely unconstitutional on its face, the Court has no power to grant injunctive relief in favor of countless non-parties. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (Thomas, J., concurring).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction should be denied.

Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

*/s/ Dylan L. Jacobs*
Nicholas J. Bronni (Ark. Bar No. 2016097)
  Arkansas Solicitor General
Michael A. Cantrell (Ark. Bar No. 2012287)
Dylan L. Jacobs (Ark. Bar No. 2016167)
  Assistant Solicitors General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-3661
Fax: (501) 682-2591
Dylan.Jacobs@arkansasag.gov

*Attorney for Defendants*

## **CERTIFICATE OF SERVICE**

I, Dylan L. Jacobs, hereby certify that on December 28, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing to any participants.

*/s/ Dylan L. Jacobs*
Dylan L. Jacobs