**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

**Arkansas Times LP**                                                                                              **Plaintiff**

v.                                           Case no.  4:18cv914-BSM

**Mark Waldrip, John Goodson,**                                                                       **Defendants**
**Morril Harriman, Kelly Eichler,**
**David Pryor, Stephen Broughton,**
**C.C. Gibson, Sheffield Nelson,**
**Tommy Boyer, and Steve Cox, in their**
**official capacity as Trustees of**
**the University of Arkansas Board of**
**Trustees.**

**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND REPLY IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiff Arkansas Times LP challenges the certification requirement and the prohibition on boycotts of Israel codified at ARK. CODE ANN. § 25-1-503(a)(1) ("the Act"). The Act requires all public contractors in this state with contracts of at least $1,000 to certify that they are not participating in, and will not participate in, boycotts of Israel for the duration of the contract, and further prohibits such boycotts by these contractors, unless they agree to accept a twenty percent reduction in payment. Federal district courts in Arizona and Kansas have entered preliminary injunctions against similar certification requirements after concluding that those challenging the laws were likely to succeed on the merits of their First Amendment claims. See *Koontz v. Watson*, 283 F. Supp. 3d 1007 (D. Kan. 2018); *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016 (D. Ariz. 2018). The same result is warranted here.

1

Plaintiff's argument is straightforward: The First Amendment protects the right to participate in political boycotts, including boycotts of territories controlled by Israel. The Act facially violates the First Amendment in at least two respects. First, the Act unconstitutionally imposes a blanket content- and viewpoint-discriminatory restriction on government contractors' protected boycott participation, as well as on their boycott-related speech and association. Second, it unconstitutionally compels Plaintiff to proclaim its views on a matter of public concern. Plaintiff's success on either of these theories would require a preliminary injunction.

Defendants do not dispute Plaintiff's standing to challenge the Act's compulsion of speech, do not advance any legitimate state interest for the Act, and do not refute that the certification requirement is content- and viewpoint-based.[1] Instead, Defendants argue that Plaintiff lacks standing to challenge the Act's prohibition on public contractors boycotting Israel. This misconstrues the Article III standing requirement: a plaintiff must have standing to bring a claim, but need not demonstrate any particular nexus between the nature of the injury and the theories offered in support of the plaintiff's claim.

Defendants also assert that boycotting is not protected by the First Amendment, but this argument directly contradicts the Supreme Court's ruling in *NAACP v. Claiborne Hardware Company*. Defendants attempt to distinguish *Claiborne* by arguing that the right to boycott derives from the right to petition, and therefore applies only to boycotts directed at U.S. governmental entities. Defendants also argue that *Claiborne* extended First Amendment protection to speech and association in support of a boycott, but not the refusal to deal that is at the heart of any boycott campaign. Defendants' cramped reading of *Claiborne* is inconsistent

---

[1] Moreover, Defendants do not dispute any of the facts asserted by Plaintiff, *see* Pl's Br. at 3–4 and Ex. 1, including the fact that, though the law went into effect in August of 2017, Plaintiff was not required or even asked by Defendants to sign the certification until October of 2018.

with both the decision's plain language and Eighth Circuit law. Defendants' reliance on *Rumsfeld v. FAIR, Inc.* and *International Longshoremen's Ass'n v. Allied International, Inc.* is similarly misplaced, as the district courts in *Koontz* and *Jordahl* recognized.

Even if the First Amendment did not protect boycotts, the Act would still not pass constitutional muster because Defendants have failed to articulate any legitimate government interest for the certification requirement. In this case, the only plausible state interests are to compel accommodation of the state's message in support of Israel and to punish disfavored beliefs—both impermissible government goals.

Further, Defendants' argument that Plaintiff will not suffer irreparable harm if preliminary relief is denied ignores not only Plaintiff's First Amendment injury, but also the existence of sovereign immunity. If preliminary relief is not granted, Plaintiff will continue to face an unconstitutional choice. And the pressure on Plaintiff, a free weekly paper, to sacrifice its First Amendment rights will only increase as it continues to lose out on contract payments it cannot recoup due to sovereign immunity. Finally, injunctive relief should not be limited to Plaintiff, because the Act is facially invalid and is infringing the First Amendment rights of contractors throughout Arkansas.

## ARGUMENT

### I. Plaintiff has standing to challenge the Act.

Defendants recognize that "Plaintiff has a single claim for relief under the First Amendment, as incorporated by the Fourteenth Amendment," *see* Defs.' Mot. to Dismiss, ECF 16 at 7, and do not contest Plaintiff's standing to assert that claim.[2] Instead, Defendants argue

---

[2] Indeed, Plaintiff has standing because the Act has imposed an injury-in-fact by requiring Plaintiff to choose between its First Amendment right not to speak on a matter of public concern and its livelihood. This injury is traceable to the Act, which, in the same provision, also prohibits

only that Plaintiff cannot raise certain theories in support of that claim. But both the Supreme Court and the Eighth Circuit have held that Article III standing is required for claims, not theories. "Once a party is properly in court to challenge a particular injury-causing event, the range of permissible argument may properly be measured by prudential concerns. . . . [T]he court should be free to consider the arguments that seem to provide the most secure basis for decision without undue concern for the conceptual nexus between argument and injury." *See* Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 13B Federal Practice and Procedure § 3531.16, at 362–63 (3d ed. 2008). Indeed, the Supreme Court has allowed plaintiffs to challenge government action not only on the basis of their own interests, or even the interests of other private parties, but also those of various branches of government. *See INS v. Chadha*, 462 U.S. 919, 935–36 (1983) (holding that an individual had standing to challenge a deportation order on a separation of powers theory that would "advance the interests of the Executive Branch" because his success on that theory would also redress his injury); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591–92 (8th Cir. 2009) ("Article III generally requires injury to the plaintiff's personal legal interests, but that does not mean that a plaintiff with Article III standing may only assert his own rights or redress his own injuries.") (internal citation omitted).

This is particularly true in the First Amendment context, where "the [Supreme] Court has altered its traditional rules of standing to permit . . . attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (internal marks and citation omitted). Plaintiffs "are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial

---

public contractors from boycotting Israel. An order enjoining the Act would redress Plaintiff's injury.

4

prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Id.* Accordingly, Plaintiff can challenge the Act's prohibition on public contractors boycotting Israel.

Furthermore, contrary to Defendants' assertion that none of the loyalty oath cases on which Plaintiff relies consider the First Amendment implications of requiring individuals to swear not to participate in expression when they have no intention of engaging in that expression, *see* Defs.' Mot. to Dismiss at 25–26, *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971) recognized a First Amendment violation in precisely such circumstances. There, the plaintiff objected to a question on her bar application requiring her to disclose "whether she had ever been a member of the Communist Party or any organization 'that advocates overthrow of the United States Government by force or violence.'" *Id*. at 4–5. There was nothing in the record to suggest that she belonged to a Communist organization—in fact, she had listed all organizations to which she belonged, and not one was identified as a potential Communist front. *See id*. at 4, 7 n.7. Nonetheless, the Supreme Court upheld her First Amendment claim, declaring: "When a State seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest. And whatever justification may be offered, a State may not inquire about a man's views or associations solely for the purpose of withholding a right or benefit because of what he believes." *Id*. at 6–7. As discussed below, the Act fails this test.

**II.     Plaintiff is likely to succeed on the merits of its First Amendment claim.**

**A. The First Amendment protects participation in political boycotts.**

The act of boycotting is protected by the First Amendment. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 915, 918 (1982); *Koontz*, 283 F. Supp. 3d at 1024 ("It is easy

enough to associate [Plaintiff's] conduct with the message that the boycotters believe Israel should improve its treatment of Palestinians. And boycotts—like parades—have an expressive quality."); *Jordahl*, 336 F. Supp. 3d at 1044 (finding it "highly likely" that "Plaintiffs will be able to establish that 'boycott,' as defined [in a similar Arizona law], burdens expressive political activity protected under the First Amendment.").

Defendants' arguments to the contrary contradict both Supreme Court and Eighth Circuit precedent. First, Defendants argue that *Claiborne* applied First Amendment protection to speech and association in support of a boycott, but not the refusal to deal at the heart of any boycott campaign. To the contrary, *Claiborne* held that the act of boycotting is protected by the First Amendment. The Court explained that the court below "did not sustain the . . . imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott. *The fact that such activity is constitutionally protected*, however, imposes a special obligation on this Court to examine critically the basis on which liability was imposed." 458 U.S. at 915 (emphasis added). In the latter sentence, "such activity," which the Supreme Court held is "constitutionally protected," could only refer to "a nonviolent, politically motivated boycott." Similarly, the Court stated that "Petitioners *withheld their patronage* from the white establishment . . . to challenge a political and economic system that had denied them the basic rights of dignity and equality. . . . While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of *nonviolent, protected activity*." *Id.* at 918 (emphasis added). Here, too, the Court could only be referring to the act of withholding patronage when it wrote "nonviolent, protected activity." Thus, *Claiborne* made clear that the First Amendment protects the act of boycotting itself, and not just the speech surrounding boycott campaigns.

6

It is also worth noting that the Act prohibits not only refusals to deal, but also "other actions that are intended to limit commercial relations with Israel[.]"ARK. CODE ANN.§ 25-1-502. Although Defendants argue that "other actions" should be interpreted narrowly, the Act's legislative findings state that "Arkansas seeks to act to implement Congress's announced policy of 'examining a company's *promotion* or compliance with unsanctioned boycotts . . . against Israel as part of its consideration in awarding grants and contracts . . . .'" S.B. 710, 91st Gen. Assemb., Reg. Sess. (Ar. 2017), *available at* http://www.arkleg.state.ar.us/assembly/2017/2017R/Acts/Act710.pdf (emphasis added). Read in light of the Act's legislative findings, "other actions" at least plausibly restricts speech and assembly promoting a boycott, such as a picket outside of a store encouraging consumers not to purchase boycotted products. At the very least, contractors who sign a form promising not to boycott will be chilled from engaging in these activities, which further supports the conclusion that the Act is facially unconstitutional because it restricts and chills protected expression and association. *See Baggett v. Bullitt*, 377 U.S. 360, 367–68 (1964); *Moonin v. Tice*, 868 F.3d 853, 861 n.5 (9th Cir. 2017).

Second, Defendants alternatively contend that *Claiborne*'s protection for boycotts derives solely from the First Amendment's Petition Clause, and that the First Amendment right to boycott extends only to boycotts directed at governmental entities within the United States. In fact, the boycott in *Claiborne* was directed at both the government and private businesses, and the boycott participants demanded *inter alia* that stores employ Black clerks and cashiers, 458 U.S. at 899. Thus, as the Court explained, the boycott sought to bring about "political, social, and economic change." *Id.* at 911; *see also id*. at 915 (describing the boycott as a "challenge to a political and economic system").

Under Defendants' theory, the boycott would have been protected only insofar as it demanded change from the U.S. government, but the Supreme Court drew no such line. Indeed, if Defendants were correct, the government could have outlawed civil rights boycotts of segregated businesses and the divestment campaign against apartheid South Africa, as well as modern boycott campaigns directed at private entities ranging from Wal-Mart to the National Rifle Association to Planned Parenthood. But Defendants are wrong. *Claiborne* squarely rested its holding that political boycotts are constitutionally protected on the right to free speech, concluding that such boycotts constitute "expression on public issues," and reaffirming the "'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Id.* at 913 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). The Court accordingly agreed with the Fifth Circuit that the Mississippi courts had given "insufficient weight to the First Amendment's protection of political speech and association," and that "speech to protest racial discrimination," such as the *Claiborne* boycott, "is essential political speech lying at the core of the First Amendment." *Id.* at 915 (quoting *Henry v. First Nat'l Bank of Clarksdale*, 595 F.2d 291, 303 (1979)).

Eighth Circuit precedent only reiterates both of these points. In *Beverly Hills Foodland,* the Eighth Circuit considered a union's call for a consumer boycott of a company designed to pressure the company to improve its treatment of Black employees, increase wages, allow employees to unionize, and lower prices. Like the boycotts prohibited by the Act, this constituted a political consumer boycott. The Eighth Circuit held that "the prime directive in the Union campaign, a boycott of Foodland, is . . . constitutionally safeguarded. *NAACP v. Claiborne Hardware Co*., 458 U.S. 886 (1982) (holding that a state tortious interference claim by targeted businesses could not be maintained against participants and organizers of a consumer boycott)."

*Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 197 (8th Cir. 1994). The boycott specifically targeted a private business and did not appeal to government actors; therefore, it did not implicate the right to petition. The Eighth Circuit nevertheless recognized its First Amendment protection.

Defendants' citations to out-of-circuit cases to suggest the opposite—that is, that boycotts can only be protected by the right to petition—are neither controlling nor persuasive. Two of the cases, *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 159 (3d Cir. 2001) and *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F. 3d 885, 889 (10th Cir. 2000) discuss *Claiborne* only to explore the contours of the *Noerr-Pennington* doctrine, not vice-versa. Although *Claiborne* recognized that boycotts may be protected as petitioning activity under the *Noerr-Pennington* doctrine, that was not the sole or even primary basis for the Court's First Amendment holding. The *Noerr-Pennington* doctrine may be extended to boycotts involving the right to petition, as *Barnes* and *Cardtoons* acknowledge, but *Claiborne* has never been limited to such boycotts, as *Beverly Hills Foodland* makes clear.

Defendants' final case, *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y. Inc.,* 968 F.2d 286, 289 (2d Cir. 1992), is also inapplicable here. There, the Second Circuit held that a campaign organized by Jewish groups to convince a resort facility to deny accommodations to Jews for Jesus was not protected by the First Amendment. *Id.* at 296–97. The court held that the defendants' threats did not constitute a protected boycott under *Claiborne*, because they were designed to achieve an objective—denying access to public accommodations based on religion—prohibited by valid state law. *Id.* at 297 (citing *Claiborne*, 458 U.S. at 915 n.49). As discussed throughout this brief, the Act at issue here is not a valid state law, and its

objectives—to compel support for the state's message in support of Israel and to punish disfavored beliefs—are impermissible.

The court further noted that the boycott at issue was distinguishable from the *Claiborne* boycott because it "was a series of private communications in the context of a private dispute." *Id.* at 298. Defendants suggest that "private" refers to the boycott's focus on a private company. But this reading would not only contradict the Eighth Circuit's controlling holding in *Beverly Hills Foodland* that boycotts of private companies, and not only U.S. government actors, are protected; it would also minimize the fact that the Jewish groups had communicated their plan to boycott only to the resort, privately. *See id.* at 289 (noting that the resort responded to the boycott before the groups contacted the press). In contrast, here, the boycotts prohibited by the Act are public campaigns and constitute "expression on public issues [which] has always rested on the highest rung of the hierarchy of First Amendment values." *Claiborne*, 458 U.S. at 913 (citation and internal quotation marks omitted). *See Jordahl*, 336 F. Supp. 3d at 1047–48 ("The Act also unquestionably touches on matters of public concern. . . . [A]ctions taken by Israel in relation to Palestine are matters of much political and public debate."); *Koontz,* 283 F. Supp. 3d at 1021–22.

Defendants also attempt to avoid the clear holding of *Claiborne* by relying on *Rumsfeld* and *Longshoremen*, neither of which apply to this case. Although Defendants attempt to characterize *Rumsfeld* as a case about boycotts, neither the word "boycott" nor any citation to *Claiborne* appears in the Court's decision, and the case cannot be read to overrule *Claiborne sub silentio*. Indeed, *Rumsfeld*'s silence with regard to *Claiborne* should not be surprising because the cases are distinguishable in a number of material respects. Unlike the boycott in *Claiborne* and the boycotts regulated by the Act in this case, *Rumsfeld* did not concern a boycott of consumer goods and services; the law at issue in *Rumsfeld* mandated a particular action, but did

not require law schools to disavow participation in boycotts of the military generally; and, whereas Congress's interest in raising and maintaining the Armed Forces was not related to the suppression of expression, the state's only plausible interest in prohibiting boycotts of Israel is to suppress disfavored expression.[3]

Similarly, *Longshoremen* cannot change the import of *Claiborne*'s holding. Importantly, *Longshoremen* was decided before *Claiborne*—and *Claiborne* made clear that *Longshoremen* describes an exception to the general rule that political boycotts are protected under the First Amendment. Specifically, *Claiborne* held that although the government cannot prohibit political boycotts generally, "[s]*econdary boycotts and picketing by labor unions* may be prohibited, as part of 'Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife.'" 458 U.S. at 912 (emphasis added) (citing, *inter alia*, *Longshoremen*). As the Arizona District Court explained, "Defendants overstate the meaning of *Int'l Longshoremen*, which was decided in the context of federal labor laws . . . [and] does not purport to state that there is no constitutional right to engage in boycotting activities." *Jordahl*, 336 F. Supp. 3d at 1041.

### B. The Act's prohibition on boycotts violates public contractors' First Amendment rights.

Thus, as *Koontz* and *Jordahl* recognized, boycott certification laws like the one at issue here unconstitutionally restrict government contractors' protected expression. "To determine whether a state is infringing on an independent contractor's rights under the First Amendment,

---

[3] The Arizona District Court's opinion in *Jordahl* confirms this distinction. 336 F. Supp. 3d at 1042. Contrary to Defendants' assertion, its logic applies equally to the Act at issue here. Although the Arkansas law does not include a provision explicitly targeting boycotts joined in "compliance or adherence to calls," the law is clearly targeted at group boycotts protesting Israel, such as Boycott, Divestment, and Sanctions ("BDS") campaigns. *See* Pl's Br. at 14.

11

courts use the same guidelines developed in [*Pickering v. Board of Education*, 391 U.S. 563 (1968)] and its progeny." *Koontz*, 283 F. Supp. 3d at 1020. If Plaintiff demonstrates that the Act suppresses protected expression and association, the government must justify its infringement on First Amendment rights. *Id*. (citing *Pickering*, 391 U.S. at 675). Where, as here, the government imposes a statutory restriction on protected expression and association, it "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995). "To make this showing, the government must establish a real harm that the law will alleviate directly." *Koontz*, 283 F. Supp. 3d at 1021 (citing *NTEU*, 513 U.S. at 475).

Here, far from establishing a real harm to the actual operation of government, Defendants have failed to even assert a state interest in the Act. Moreover, any state interest that might be asserted is fatally undercut by the state's wholesale abandonment of any such interest upon a twenty percent discount in the contract price. *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994); *Koontz*, 283 F. Supp. 3d at 1023.

### C. Even if boycotts are not protected, the Act violates the First Amendment.

The state cannot compel state contractors to disavow participation in expressive activity and association, including a political boycott. *See Cole v. Richardson*, 405 U.S. 676, 680 (1972) (stating that public employment may not be conditioned on an oath "denying past, or abjuring future" expressive or associational activities); *Baird*., 401 U.S. at 6 ("when a State attempts to make inquiries about a person's beliefs or associations, its power is limited by the First Amendment"); *see also Agency for Int'l Dev. v. All. for Open Society Int'l, Inc*., 570 U.S. 205, 217–18 (2013) (holding that the government could not require organizations to adopt a policy

opposing prostitution in order to receive government funds). Requiring the Arkansas Times to disavow participation in political boycotts "is akin to forcing plaintiff to accommodate [Arkansas's] message of support for Israel." *Koontz*, 283 F. Supp. 3d at 1024.

But even if the Court declines to hold that boycotts are protected by the First Amendment, the Act nevertheless infringes on Plaintiff's First Amendment rights. The Supreme Court has held "time and again that freedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'" *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2463 (2018) (quoting *Wooley v. Maynard,* 430 U.S. 705, 714 (1977)). "[T]his general rule [against compelled speech] . . . applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995).

In order for any certification requirement to survive such scrutiny, it must, at the very least, be supported by a legitimate state interest. Here, Defendants have articulated no state interest whatsoever, nor have they contested Plaintiff's arguments showing that the Act is intended to accomplish impermissible goals: compelled accommodation of the state's message of support for Israel and the silencing of a disfavored viewpoint. *See* Pl's Br. at 14–17.

The cases Defendants cite to argue that only compelled ideological statements can violate the First Amendment do not in fact support their view. Contrary to Defendants' characterization, the petitioner in *Grove City College v. Bell*, challenged "the conditioning [of] federal assistance *on compliance with Title IX*" on First Amendment grounds. 465 U.S. 555, 576 (1984). The petitioner did not assert a First Amendment challenge to the regulation that required colleges to certify their compliance with Title IX, instead challenging that certification requirement only on statutory grounds. *Id.* at 574–75. Accordingly, the Supreme Court did not consider, much less

reach, a First Amendment compelled speech argument. *Id.* at 574–75. Moreover, unlike the government's interest in Title IX, any plausible state interest in the Act is impermissible. Similarly, in *United States v. Sindel*, the Eighth Circuit held that "the First Amendment protection against compelled speech" cannot prevent an "essential operation[]of government" that may require such speech "for the preservation of an orderly society." 53 F.3d 874, 878 (8th Cir. 1995). No such government interest is present here—and, as noted above, if the state were to assert any interest at all, "the credibility of [that] rationale for restricting speech" would be "diminish[ed]" by the Act's 20 percent discount alternative. *See City of Ladue v. Gilleo*, 512 U.S. 43, 52 (1994).

### III. Plaintiff will suffer irreparable harm if a preliminary injunction is not granted.

Plaintiff is suffering irreparable harm, and will continue to do so unless the motion for preliminary injunction is granted. Astonishingly, Defendants assert that Plaintiff will not suffer irreparable harm because it can recover contract losses in a court of law. However, Defendants have sovereign immunity from any money damages under the Eleventh Amendment in a §1983 action, as well as sovereign immunity in state courts under the Arkansas Constitution. *See Bunch v. Univ. of Arkansas Bd. of Trustees*, 863 F.3d 1062, 1067–68 (8th Cir. 2017); *Bd. of Trustees of Univ. of Arkansas v. Andrews*, 20535 S.W.3d 616, 619 (2018). That immunity cannot be waived, even by the legislature. *Id*. at 622. Thus, Plaintiff has no way to recover the loss of advertising revenue from Defendants. The application of sovereign immunity to bar claims under Section 1983 constitutes irreparable injury as a matter of law. *Bunch*, 863 F.3d at 1068; *Chu Drua Cha v. Noot*, 696 F.2d 594, 600 (8th Cir. 1982); *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994). Furthermore, as Defendants point out, Plaintiff is a free weekly newspaper, which means that advertising is crucial to its economic survival.

In any case, Plaintiff need not prove economic harm, as Supreme Court and Eighth Circuit precedent dictate that the loss of First Amendment rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Right now, Plaintiff continues to face the difficult choice between forgoing thousands of dollars in essential advertising revenue and forfeiting its First Amendment rights by signing the Act's anti-boycott certification. *See Koontz,* 283 F. Supp. 3d at 1026 ("Plaintiff's harm stems not from her decision to refuse to sign the certification, but rather from the plainly unconstitutional choice the . . . Law forces plaintiff to make."). If Plaintiff is compelled, as an act of self-preservation, to sign the certification while this action remains pending, its First Amendment rights will be irrevocably infringed. The Act thus continuously operates to pressure Plaintiff, and other government contractors, to forfeit their First Amendment rights.

**IV.     The balance of harms weighs in Plaintiff's favor.**

Here, the balance of equities tips decidedly in Plaintiff's favor. *Phelps-Roper v. Nixon,* 509 F.3d 480, 485 (8th Cir. 2007). Without a preliminary injunction, enforcement of the Act will prevent Plaintiff from exercising its First Amendment rights and will cause it to suffer financially. On the other hand, if the Court grants a preliminary injunction, Defendants will suffer no harm. *See Jordahl*, 336 F. Supp. 3d at 1050 ("Defendants will experience little to no hardship by enjoining the enforcement of a law that does nothing to further any economic state interest and infringes on First Amendment protections."). Similarly, the grant of a preliminary injunction would serve the public interest by upholding the Constitution and preventing the enforcement of unconstitutional laws. *Phelps-Roper,* 509 F.3d at 485.

**V.     A broad preliminary injunction is necessary to prevent further harm to contractors' First Amendment rights.**

Given that the Act facially violates the First Amendment, the appropriate remedy is an

injunction preventing Defendants from enforcing the requirement against all government contractors, not just Plaintiff. Defendants argue that Plaintiff lacks standing to seek such an injunction. To the contrary, a court may "reach beyond the particular circumstances of [the] plaintiffs" if they satisfy the standard for a facial challenge. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). This is particularly true in the First Amendment context. *See, e.g., Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (internal marks omitted) (granting injunction not limited to plaintiffs in part because "the ongoing enforcement of the potentially unconstitutional regulations . . . would infringe not only the free expression interests of [plaintiffs], but also the interests of other people subjected to the same restrictions").

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court grant its motion for a preliminary injunction and enjoin Defendants from enforcing § 25-1-503(a)(1) of the challenged Act 710 during the pendency of this litigation, and that the Court deny accordingly the Defendants' Motion to Dismiss.

Dated: January 11, 2019

Respectfully submitted,

Vera Eidelman
Vera Eidelman *(admitted pro hac vice)*
Brian Hauss *(admitted pro hac vice)*
ACLU Foundation
Speech, Privacy & Technology Project
125 Broad St., 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org
veidelman@aclu.org

Bettina Brownstein
Bettina E. Brownstein (85019)
Bettina E. Brownstein Law Firm

904 West Second St., Suite 2
Little Rock, Arkansas 72201
Tel: (501) 920-1764
 Email:  bettinabrownstein@gmail.com

John L. Burnett
John L. Burnett  (77021)
Lavey & Burnett
904 West Second St.
Little Rock, Arkansas 72201
Tel:  (501) 376-2269
 Email:  jburnett@laveyburnett.com

*Attorneys for Plaintiffs*