**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

**ARKANSAS TIMES LP**                                                              **PLAINTIFF**

     **v.**                    **Case No. 4:18CV00914 BSM**

**MARK WALDRIP, JOHN GOODSON,**
**MORRIL HARRIMAN, KELLY EICHLER,**
**DAVID PRYOR, STEPHEN BROUGHTON,**
**C.C. GIBSON, SHEFFIELD NELSON,**
**TOMMY BOYER, and STEVE COX, in their**
**official capacities as Trustees of the University of**
**Arkansas Board of Trustees**                                          **DEFENDANTS**

## REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

As framed by Plaintiff, this case is about a hypothetical violation of the First Amendment.  If some hypothetical state contractor wished to boycott Israel, would Act 710's Israeli-boycott prohibition hypothetically violate that contractor's First Amendment rights?  Whatever the answer to that abstract legal question, Plaintiff's most recent brief does nothing to remedy its failure to establish its standing to bring the question before this Court.  Plaintiff has never boycotted Israel, has no plans to boycott Israel, and has not been chilled from boycotting Israel by the Act.  As a result, Plaintiff has no standing to claim that the Act unconstitutionally prohibits boycotting Israel.

Regardless of Plaintiff's lack of standing to challenge Act 710, the Act does not violate the First Amendment.  First and foremost, that is because boycotting is neither speech nor inherently expressive conduct.  A boycott expresses a message only when accompanied by explanatory speech.  Relying on this principle, the Supreme Court has held that boycotts are not protected by the freedom of speech—even politically motivated boycotts, like a law school's refusal to allow military recruiters on campus.  Plaintiff tries to avoid that holding with the

illogical suggestion that somehow the consumer boycotts in this case are more expressive than a military-recruiter boycott.  By limiting only the ability to boycott Israel—not the ability to advocate for boycotting Israel—Act 710 does not infringe Plaintiff's free-speech rights. Boycotting itself, insofar as it is protected by the First Amendment at all, is protected only by the right to petition the government.  By definition, a boycott of a foreign power falls outside that protection.  Thus failing to bring a valid right-to-petition claim, Plaintiff cannot then transform that claim into a compelled-speech claim.  Act 710 requires Plaintiff only to make the truthful certification about its boycotting activities.

Whether because Plaintiff lacks standing, or because it has failed to state a claim, the Court should grant Defendants' motion to dismiss.  And because Plaintiff alleges monetary harm caused by Act 710, it will suffer no irreparable injury.  The Court should also, therefore, deny Plaintiff's motion for a preliminary injunction.

## I.    Plaintiff lacks standing to claim that Act 710 unconstitutionally prohibits boycotting Israel.

Plaintiff claims that Act 710 violates the First Amendment for two reasons:  because it compels state contractors to disavow Israel-boycotting, and because it prohibits state contractors from boycotting Israel.   Plaintiff concedes that it has no intention of boycotting Israel. Nevertheless, it claims that it has standing to challenge the Act's prohibition of boycotting Israel because it has standing to challenge the Act's "compulsion" of a truthful statement on its part that it does not intend to boycott Israel.  That is mistaken.  Even assuming Plaintiff has standing to press its meritless claim that the Act's requirement that it merely attest to the truth unconstitutionally compels it to speak, it cannot leverage that standing to challenge the Act's separate prohibition of state-contractor Israel boycotts.

At oral argument on its motion for a preliminary injunction, Plaintiff conceded that it has no intention of boycotting Israel and that the Act has not chilled it from doing so. *See* Tr. of Prelim. Inj. Hearing at 9:17–19. It nevertheless claims that it has standing to challenge the Act's prohibition of what it claims is a sort of "speech" that it has no intention whatsoever of making—namely, boycotting Israel—because it has standing to challenge the Act's compulsion of a different sort of speech—namely, a certification that it will not boycott Israel. According to Plaintiff, so long as it has standing to challenge the Act on one First Amendment theory, it can challenge the Act on any First Amendment theory. Indeed, on Plaintiff's view, even if its compelled-speech theory failed, it could press forward and obtain relief on First Amendment theories that it lacked standing to raise on a freestanding basis. Nothing that Plaintiff cites supports that curious proposition.

In arguing that it can pursue First Amendment theories that it has no standing to individually raise, Plaintiff relies on two cases. The first, *INS v. Chadha*, 462 U.S. 919 (1983), held that an immigrant had standing to challenge, on separation-of-powers grounds, the constitutionality of the one-house veto where his deportation was mandated by a one-house veto. *See id.* at 935–36. There, the immigrant *was* injured by the constitutional violation he sought to challenge. Here, Plaintiff is not injured by the Act's prohibition of Israel-boycotting. Plaintiff suggests *Chadha* is analogous because the immigrant's separation-of-powers theory would "advance the interests of the Executive Branch . . . rather than simply [his] private interests," *id.*, but this misses the point. His theory *did* advance his own interests so he had standing to argue it. All that *Chadha* holds is that someone with standing to argue a theory does not lose it because his argument advances others' interests as well as his own. And the Court's subsequent discussions of *Chadha* make it still less relevant to Plaintiff's standing here. *See Bond v. United States*, 564 U.S. 211, 222 (2011) (clarifying that *Chadha*'s standing holding rested on the ground that

3

"[t]he structural principles secured by the separation of powers protect the individual as well" as the branches of government).

Second, in *Braden v. Wal-Mart Stores, Inc.*, an ERISA case on which Plaintiff relies, the Eighth Circuit held that a plan participant could raise breaches of fiduciary duty that took place both before and after he became a plan participant because ERISA gives plan participants statutory standing to sue "in a representative capacity on behalf of the plan as a whole[.]"  588 F.3d 585, 593 (8th Cir. 2009) (internal quotation marks omitted) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985)).  No such statutory provision gives Plaintiff representative standing here.  And where no provision of that sort is present, the Eighth Circuit has made clear that "[a]s a general rule, a plaintiff may only assert his own injury in fact and 'cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Hodak v. City of St. Peters*, 535 F.3d 899, 904 (8th Cir. 2008) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).  That general rule holds unless "some barrier or practical obstacle . . . prevents or deters the third party from asserting his or her own interest."  *Id.* (internal quotation marks omitted) (quoting *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 106 (1st Cir. 1995)).  Nothing prevents contractors from challenging the Act once they—unlike Plaintiff—have been actually chilled from boycotting Israel, or penalized for doing so.  Plaintiff cannot, therefore, assert those contractors' rights.

Finally, Plaintiff relies on a treatise and an inapposite analogy from overbreadth doctrine. The treatise, Wright and Miller's Federal Practice and Procedure, makes the purely prescriptive suggestion that if a party has an Article III injury, courts "should be free to consider [its] arguments . . . without undue concern for the conceptual nexus between argument and injury." Charles A. Wright et al., 13B Federal Practice and Procedure § 3531.16 (3d ed. 2008).  Not a single case is cited in support of that proposition.  And in the ten years since that language was

written by Wright and Miller's successors, neither the Supreme Court nor a single court of appeals has ever cited it. The treatise's argument rests only on a strained distinction of *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006). But even the treatise concedes *Cuno* held that a litigant needs standing for each of his claims and that he cannot, "by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him." *Id.* at 353 n.5. On this treatise's view, standing becomes merely a matter of artful pleading. If Plaintiff had pled two separate First Amendment claims, one sounding in compelled speech and the other sounding in speech prohibition, then Plaintiff would lack standing to raise the speech-prohibition claim even under the treatise's view. But because Plaintiff nominally pleads a single First Amendment claim that rests on two separate arguments or "theories," Plaintiff can, according to the treatise, argue the theory it would lack standing to raise if brought as a separate claim. Article III's limits on the federal courts' jurisdiction cannot be so easily evaded.

Plaintiff's analogy from overbreadth doctrine fares no better. The Supreme Court's overbreadth cases hold that a litigant whose speech is prohibited by a statute can attack that prohibition as unconstitutionally overbroad because its prohibition sweeps too far, even if it would be possible to constitutionally prohibit the litigant's speech through a narrower statute. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973). In the first place, Plaintiff is not making and does not purport to be making an overbreadth challenge, so overbreadth's "departure from traditional rules of standing," *id.* at 613, is irrelevant here and does not militate in favor of another, different kind of departure. Second, in the overbreadth cases, the plaintiff's speech *is prohibited* by the statute he challenges, and unconstitutionally so under overbreadth doctrine,

even if the state could constitutionally target it by narrower means.  Here, Plaintiff has no

intention at all to engage in the so-called speech the Act prohibits.

## II.     Because boycotts are protected by the First Amendment only insofar as they petition the government, Plaintiff has no First Amendment right to boycott Israel.

### A.     Boycotts are not protected by the freedom of speech.

Boycotts, even when politically motivated, are themselves neither speech nor inherently

expressive conduct.  For this reason, in *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), the Supreme

Court unanimously held that the First Amendment did not protect law schools' boycott of

military recruiters taken out of disagreement with military policies.  The Court made clear that

prohibiting this boycott neither regulated speech nor regulated inherently expressive conduct.  *Id.*

at 61–66.  The schools' boycott of military recruiters was not inherently expressive, the Court

explained, because its expressive meaning only became clear when accompanied by

"explanatory speech[.]"  *Id.* at 66.  Similarly, in *International Longshoremen's Ass'n v. Allied*

*International, Inc.*, 456 U.S. 212 (1982), the Court held that a union's politically motivated

boycott of Soviet goods was "clear[ly]" not protected by the First Amendment, because the First

Amendment does not protect "conduct designed not to communicate but to coerce[.]"  *Id.* at 226.

These precedents mandate a conclusion that the pure boycotting activity the Act prohibits is not

protected by the First Amendment.

Plaintiff's attempts to distinguish these decisions are entirely unavailing.  It first argues

that *FAIR* was not "a case about boycotts."  Doc. 20 at 10.  But boycotting was just what was at

issue in *FAIR*.  By denying military recruiters access to their campuses, the law schools in *FAIR*

refused to deal with those recruiters on equal terms as they dealt with other, nonmilitary

recruiters.  That was a boycott of military recruiters.  *See The American Heritage Dictionary of*

*the English Language* 220 (5th ed. 2011) (defining "boycott" as "abstaining from using, buying,

or *dealing with*, or participating in") (emphasis added).  Indeed, if a school were to deny Israeli recruiters access to its campus, it would be boycotting Israel as the Act defines that term, and would be in violation of the Act.  *See* Ark. Code Ann. 25-1-502(1)(A)(i) (defining "boycott of Israel" to include "refusals to deal . . . with persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner"); Ark. Code Ann. 25-1-503(a)(2) (prohibiting public entities from themselves "[e]ngag[ing] in boycotts of Israel").

Next, Plaintiff argues that *FAIR* is distinguishable because it did not concern "a boycott of consumer goods and services."  Doc. 20 at 10.  That is a distinction without a difference; a boycott of consumer goods and services is no more "inherently expressive" than a boycott of military recruiters.  *See FAIR*, 547 U.S. at 66.  Indeed, it is even less expressive on *FAIR*'s logic. The highly visible banishment of military recruiters from law school campuses to interview at off-campus locations would at least be perceived and potentially understood by some observers without explanatory speech.  *See id.* (discussing hypothetical "observer who sees military recruiters interviewing away from the law school").

With boycotts of Israeli goods, by contrast, observers are extremely unlikely to notice whether a state contractor silently abstains from purchasing Israeli goods without the help of explanatory speech.  And if they did notice, they would likely think nothing of it.  Any number of companies simply happen not to purchase Israeli goods for legitimate business reasons.  There is absolutely no way, absent explanatory speech, to distinguish those companies from companies that intentionally boycott Israel.  Because explanatory speech is necessary to explain what a decision not to purchase Israeli goods is intended to express, that decision is not inherently expressive conduct and is not protected by the First Amendment.  *See FAIR*, 547 U.S. at 66.

Although Defendants previously explained this point at length, *see* ECF No. 14 at 12–14; ECF No. 16 at 14–15.  Plaintiff has offered no response whatsoever.

Finally, Plaintiff offers two distinctions that attempt to rest *FAIR* on different grounds than the ones the Court gave.  It first points out that the law at issue in *FAIR* only targeted a particular kind of military boycott and did not forbid military boycotts generally.  That is true, but again irrelevant.  The Court did not hold that the Solomon Amendment was constitutional because it only banned one kind of military boycott.  It held that the Solomon Amendment was constitutional because boycotting military recruiters was not speech or expressive conduct.  A broader prohibition would have been constitutional on the Court's logic.  Second, and lastly, Plaintiff argues that Congress's interest in passing the Solomon Amendment differs from Arkansas's in enacting the Act.  This too is irrelevant.  Regardless, Plaintiff is mistaken in suggesting that Arkansas's interest in enacting the Act is to suppress disfavored expression.  The Act instead furthers Arkansas's interests in trade policy and in avoiding dealing with contractors who engage in unsound business practices, as the Act states.  *See* Ark. Code Ann. 25-1-501.  *FAIR* did not hold that the Solomon Amendment was constitutional because Congress's interests in protecting the military justified the law; it held it was constitutional because the supposed speech it regulated was not speech or expressive conduct at all.

As for *Longshoremen's*, Plaintiff tacitly concedes that it involved a politically motivated boycott.  *See* Doc. 20 at 11 (claiming it "describes an exception to the general rule that political boycotts are protected under the First Amendment").  It claims, however, that *Longshoremen's* stands for the bizarre rule that while politically motivated boycotts are generally protected by the First Amendment, they become unprotected when the boycotter is a labor union.  The First Amendment does not discriminate against labor unions.  *See Citizens United v. FEC*, 558 U.S.

310 (2010) (striking down ban of independent political expenditures by corporations and unions that was defended on the theory that corporations and unions had weaker First Amendment rights than individuals).   *Longshoremen's* does not rest on such an anti-union rationale.   Rather, *Longshoremen's* flatly held that the First Amendment did not protect "conduct designed not to communicate but to coerce."  *Longshoremen's*, 456 U.S. at 226.   The unprotected conduct was "that aspect of the union's efforts to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea[.]"  *Id.* at 226 n.26 (internal quotation marks omitted) (quoting *NLRB v. Retail Store Emps. Union*, 447 U.S. 607, 619 (1980) (Stevens, J., concurring in part and concurring in the result)).   Only after making that statement did the Court observe, in passing, that "[t]he labor laws reflect a careful balancing of interests," *id.*; the Court, however, did not rest its holding on a labor-specific balancing analysis, which it did not, at any point in its opinion, perform.

**B.**     **Neither *Claiborne* nor Eighth Circuit precedent interpreting it hold that boycotting is protected speech.**

Against these precedents, Plaintiff relies exclusively on *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).  As Defendants explained in support of their motion to dismiss and in their response to Plaintiff's preliminary-injunction motion, to the extent the Court held that the *Claiborne* boycotters were engaged in protected *speech*, protected association, or expressive conduct, it held so solely because of their speech and associational activities advocating for and organizing the boycott.  To the extent the Court held that the boycott itself was protected by the First Amendment, it did so because the boycott was a form of petition of the local government, protected by the First Amendment's Petition Clause.  The boycotting activities prohibited by the Act are solely boycotting conduct itself, not boycott-advocating speech, and the boycotting the

Act prohibits does not seek to petition the federal, state or local government, but only, at most, the government of a foreign state.  Therefore, it is not protected by *Claiborne*.

Plaintiff completely fails to dispel either of Defendants' points about *Claiborne*.  The very best it can do in attempting to show that *Claiborne* held boycotting itself is protected speech is to point to a stray statement by the Court at the point in its opinion where it had already decided the key legal issues in the case and was turning to address whether the judgment below imposed liability for protected or unprotected conduct.  At that point, the Court said that "such activity is constitutionally protected," where the antecedent of "such activity" was "a nonviolent, politically motivated boycott."  *Claiborne*, 458 U.S. at 915.  But Plaintiff's reliance on that statement overlooks the fact that it followed eight pages of reasoning on *why* the "nonviolent, politically motivated boycott" before the Court was protected.  *See id.* at 907–15.  Tellingly, Plaintiff does not cite even a single snippet of language from those eight pages in support of its argument that boycotting is speech, because there is not a word in them that says that boycotting itself is protected *speech* or expressive conduct.

Rather, the Court said essentially two things in those pages.  First, it held that meetings, speeches, and picketing, along with encouraging the boycott, were protected speech, expressive conduct, or association.  *See, e.g.*, *id.* at 907 (enumerating "elements of the boycott" that were "form[s] of speech or conduct that [were] ordinarily entitled to protection," namely "a meeting," "speeches and nonviolent picketing," and "encourag[ing] others to join"); *id.* at 911–12 (reasoning that "the boycott clearly involved constitutionally protected activity," namely "[t]he established elements of speech, assembly, association, and petition").

Second, it explained that "[t]he presence of [this] protected activity . . . d[id] not end the relevant constitutional inquiry."  *Id.* at 912.  What ultimately did end the inquiry was the fact that

"a major purpose of the boycott in this case was to influence governmental action" and to "effectuate rights guaranteed by the Constitution itself." *Id.* at 914. Here, the Court analogized to its *Noerr-Pennington* doctrine, where it had held that economic conduct that would otherwise violate the Sherman Act is protected if it "was directed toward obtaining governmental action." *Id.* at 913 (quoting *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961)). That doctrine rested on the theory that the Court should avoid reading the Sherman Act to impinge on "the right of petition[ing]" the government guaranteed by the First Amendment. *Id.* (internal quotation marks omitted) (quoting *Noerr*, 365 U.S. at 138). And the Court also relied on Eighth Circuit precedent holding that, under *Noerr-Pennington*'s logic, a boycott of states that had not ratified the Equal Rights Amendment was protected by "the right to petition"—not by the freedom of speech. *Id.* at 914 n.48 (internal quotation marks omitted) (quoting *Missouri v. Nat'l Org. of Women*, 620 F.2d 1301, 1317 (8th Cir. 1980)).

Given all this, when the Court finally said that the *Claiborne* boycotters' nonviolent activities were protected by the First Amendment, it meant two things: (1) that their speech, meetings, and picketing were protected speech, expressive conduct, or association, protected by the First Amendment's Freedom of Speech clause; and (2) that their boycott itself was a protected form of petitioning local government, protected by the First Amendment's *Petition* Clause. Pointing to isolated statements in *Claiborne* that the *Claiborne* boycotters' nonviolent activities were generally protected by the First Amendment does not help resolve what part of the First Amendment protected their activities. What does is the Court's actual constitutional analysis. From that analysis, it is clear that the Court never held that boycotting itself, as distinguished from the speech, picketing, and association accompanying it, was protected speech

or expressive conduct.  Rather, the Court held that the boycott at issue there was a protected petition of local government, unlike the boycotting at issue here.

As to Plaintiff's argument that *Claiborne* protects pure boycotting activity that does not petition federal, state, or local government, it rests on a non sequitur and a series of quotations taken out of context.  The non sequitur is that *Claiborne* is not really about the right to petition because the *Claiborne* boycotters made demands of private business as well as their local government.  *See* Doc. 20 at 7.  In fact, *Claiborne* analogized from *Noerr* (a petition case) at length and mentioned "the right of the people to petition their representatives in government" three times in the critical two pages preceding its First Amendment holding.  *Id.* at 913.  Of the boycotters' seven demands discussed in the Court's opinion, just one was directed to private actors.  *See Claiborne*, 458 U.S. at 899–900 (discussing demand for retailers to employ black clerks and cashiers).  That one demand did not make their boycott any less a petition of local government.  Had the boycotters *only* petitioned private employers, their conduct would not have been protected by the Petition Clause.  But the fact that "*a* major purpose of the boycott . . . was to influence governmental action" rendered the boycott protected.  *Id.* at 914 (emphasis added).  The boycotters were engaged in a single boycott with a predominantly protected purpose, not multiple boycotts with different purposes.

Plaintiff also points to a series of quotations that it suggests equate boycotts with speech, as opposed to petitioning activity.  None of them actually do.  It writes, for example, that the Court stated that "boycotts constitute 'expression on public issues.'"  Doc. 20 at 8 (quoting *Claiborne*, 458 U.S. at 913).  But the Court only said in the sentence Plaintiff quotes that "expression on public issues" is protected by the First Amendment, referring to the *speech* advocating the boycott for which the *Claiborne* boycotters were held liable.  Plaintiff quotes a

number of other statements in the opinion to the effect that "political speech" is protected by the First Amendment, Doc. 20 at 8 (quoting *Claiborne*, 458 U.S. at 915), but nowhere in those passages does the Court equate boycotting itself with political speech.  Again, the Court was referring to the boycotters' advocacy of their boycott and to their written petition of local government.

Further, as discussed in Defendants' previous submissions, an understanding of *Claiborne* that extends its protection of boycotting itself beyond the right to petition is contrary to the understanding of four circuits, including the Eighth.  They have read *Claiborne* to merely "extend[] the [right-to-petition-based *Noerr*] doctrine beyond the antitrust context to a limited extent."  *In re IBP Confidential Bus. Documents Litig.*, 755 F.2d 1300, 1312 (8th Cir. 1985). Plaintiff, ignoring *IBP*, inaccurately claims that Defendants only cite "out-of-circuit cases" for this point and feebly attempts to distinguish two of those cases on the ground that they discussed *Claiborne* "only to explore the contours of the *Noerr-Pennington* doctrine, not vice-versa."  Doc. 20 at 9.  For whatever purpose those cases discussed *Claiborne*, they clearly say that the Court extended *Noerr-Pennington* "outside of the antitrust context [in *Claiborne*] solely on the basis of the right to petition."  *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 889 (10th Cir. 2000) (en banc).

Plaintiff is forced to concede that the Second Circuit's decision in *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.*, 968 F.2d 286 (2d Cir. 1992), which also read *Claiborne* in this way, did so in the context of a direct application of *Claiborne*, but unsuccessfully attempts to distinguish it on other grounds.  Plaintiff correctly points out that in that case, the Second Circuit reasoned in part that the boycott there was unprotected because the boycotters sought to induce the target of their boycott to violate antidiscrimination law by

denying accommodations to Jews for Jesus on the basis of its religious beliefs, whereas the *Claiborne* boycotters sought to induce compliance with the Constitution.  But that was not the sole ground of decision in *Jews for Jesus*.  Rather, the Second Circuit also reasoned that "in contrast to the boycott in *Claiborne Hardware*, the instant conduct was not . . . designed to secure governmental action to vindicate legitimate rights, but was a series of private communications in the context of a private dispute."  *Jews for Jesus*, 968 F.2d at 298.  "Accordingly," the Second Circuit concluded, "the safe harbor carved out by *Claiborne Hardware* for certain boycott activity is unavailable to defendants."  *Id.*  So too here; the boycotting activities the Act prohibits seek to induce private businesses not to deal with Israel.

Plaintiff's final attempt at resuscitating its reliance on *Claiborne* is to claim that a sentence of dictum in a 1994 Eighth Circuit opinion held that pure boycotting activities intended to induce private action are protected by the First Amendment under *Claiborne*.  That is incorrect.  In *Beverly Hills Foodland, Inc. v. United Food and Commercial Workers Union, Local 655*, 39 F.3d 191 (8th Cir. 1994), a pre-*FAIR* case, a union was sued for picketing and calling for a boycott of a grocery store that the union claimed engaged in discriminatory hiring.  The grocery store's claims were based solely on the union's distribution of a handbill, defamatory statements made by a union representative, defamatory statements on union picket signs, and defamatory statements made by union picketers.  *See id.* at 193–94 (describing the first five counts of the store's complaint); *id.* at 194 (stating that the next and last five counts "were based on the same factual circumstances" as the first five).  The union was not sued for boycotting, but for speech.

In affirming the dismissal of one of the store's speech-based tortious-interference claims, the Eighth Circuit explained that "the Union's conduct was constitutionally protected" because

14

"the activity of peaceful pamphleteering is a form of communication protected by the First Amendment." *Id.* at 197. The court added that it did not matter that "the communications [we]re intended to exercise a coercive impact." *Id.* Having held that the pamphleteering over which the store sued was constitutionally protected, the court then added that "the prime directive" of the pamphleteering, "a boycott of Foodland, is similarly constitutionally safeguarded," citing *Claiborne*. *Id.* This stray dictum was entirely unnecessary to the court's decision; pamphleteering is protected speech regardless of whether the pamphlets advocate speech or something else, as the court itself recognized when it said that pamphleteering is protected speech even when it is intended to induce coercive conduct. Had the union distributed pamphlets encouraging shoppers to buy American-made goods, or to tip underpaid baggers, that would be protected speech, even though purchasing American-made goods or tipping baggers is not speech. *Foodland*'s holding is only that pamphleteering is protected by the First Amendment.

## III.    The Act solely prohibits boycotting Israel, not advocacy of it.

In a paragraph of its opposition to Defendants' motion to dismiss, Plaintiff suggests that the Act may "at least plausibly" be read to restrict speech advocating an Israel boycott. Doc. 20 at 7. It cannot. The Act defines a boycott of Israel as "refusals to deal, terminating business activities, or other actions that are intended to limit commercial relations with Israel, or persons or entities doing business in Israel[.]" Ark. Code Ann. 25-1-502(1)(A)(i). Plaintiff argues that the phrase "other actions" can be read to cover advocacy of boycotting.

An Arkansas court would not read the phrase that way for three reasons. First, Arkansas follows the canon of *ejusdem generis*—that general catch-all terms at the end of a list are read to bear a similar meaning to specific terms that precede it. *See Edwards v. Campbell*, 370 S.W.3d 250, 253 (Ark. 2010). Here, that means that "other actions," like "refusals to deal" and

"terminating business activities," refers to pure boycotting conduct.   Second, the Act itself distinguishes between boycotting actions and advocacy for them when it provides that "[a] company's statement that it is participating in boycotts of Israel, or that it has taken the boycott *action* at the request, in compliance with, or in furtherance of *calls for* a boycott of Israel," can be considered as evidence that a company is boycotting Israel.   Ark. Code Ann. 25-1-502(1)(B) (emphasis added).   On Plaintiff's view, a "call for a boycott of Israel" is itself a boycott of Israel. Had the General Assembly intended to define boycotting Israel to include calls for boycotting Israel, it would have used that phrase in the boycotting definition instead of referring to "other actions."   Third, even if "other actions" were ambiguous on whether that phrase included speech, which is the most that Plaintiff is willing to claim, *see* Doc. 20 at 7 (describing this only as an "at least plausibl[e]" reading), constitutional avoidance would require a reading of the Act that did not restrict pure speech.   *See, e.g., Bakalekos v. Furlow*, 410 S.W.3d 564, 571 (Ark. 2011) ("An act will be struck down only when there is a clear incompatibility between the act and the constitution.").

## IV.   Plaintiff's compelled-speech claim rises or falls on whether boycotting Israel is itself protected speech, expressive conduct, or associational activity.

Plaintiff claims that the Act's certification requirement unconstitutionally compels it to say that it will not boycott Israel.   That claim is only correct if boycotting Israel is itself speech, expressive conduct, or associational activity.   The compelled speech doctrine prohibits states from compelling private persons or entities to espouse a particular "ideological point of view," *Wooley v. Maynard*, 430 U.S. 705, 715 (1977), or a particular government "orthodox[y] in politics, nationalism, religion, or other matters of opinion[.]"   *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).   It does not, however, prohibit the government from requiring the disclosure of "purely factual . . . information[.]"   *Zauderer v. Office of Disciplinary*

*Counsel*, 471 U.S. 626, 651 (1985); *see also Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 734–35 (8th Cir. 2008) (en banc) ("[W]hile the State cannot compel an individual simply to speak the State's ideological message, it can use its regulatory authority to require a physician to provide truthful, non-misleading information[.]").   Therefore, certification requirements in government contracting, or questions in applications for government employment and licenses, generally raise no First Amendment concern.   They merely seek the disclosure of truthful information about the contractor or applicant.   For example, no one would question that Arkansas's requirement that government contractors promise that they will not "discriminate against any qualified employee or qualified applicant for employment because of race, color, creed, national origin, or ancestry" is constitutional.   Ark. Code Ann. 25-17-101.

There is, however, an exception to the general First Amendment permissibility of certification or disclosure requirements in cases where the certification or disclosure that the government requires goes to whether an individual has engaged, or intends to engage in, speech or conduct that is itself protected by the First Amendment.   As the Supreme Court held in *Cole v. Richardson*, 405 U.S. 676 (1972), on which Plaintiff relies, the government may not "condition employment on taking oaths *that impinge on rights guaranteed by the First Amendment*," such as "an oath that one has not engaged, or will not engage, in *protected speech activities*," or "an oath denying past, or abjuring future, *associational activities within constitutional protection*[.]"   *Id.* at 680 (emphasis added).   Requiring oaths or contractual promises not to engage in activities that the First Amendment does *not* protect does not fall afoul of this rule; otherwise, every time that the government required a contractor to promise anything in its contract, it would be compelling speech.

In support of its argument that all government-contracting certification requirements are subject to strict scrutiny under the First Amendment, Plaintiff cites the Supreme Court's statement in *Hurley* that "th[e] general rule, that the speaker has the right to tailor the speech, applies . . . equally to statements of fact the speaker would rather avoid[.]" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). But this rule only applies where a speaker is already engaged in some speech that the speaker has the right to "tailor," as illustrated by the two cases *Hurley* cited in support of the proposition. In the first, *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995), a state made every author of campaign literature disclose his identity, thereby "regulat[ing] . . . the content of speech." *Id.* at 345. In the second, *Riley v. National Federation of the Blind*, 487 U.S. 781 (1988), the state required professional fundraisers to disclose, when raising funds, the percentage of gross receipts they turned over to charities. The Court explained that this law "burden[ed] the protected speech" in which the fundraisers were already engaged. *Id.* at 798. By contrast, the Act does not force state contractors to interject statements about their Israel-boycotting activities into their speech on some subject; it requires them to make a certification in a contract containing any number of other permissible state-mandated promises.

## V.      Plaintiff will not suffer irreparable harm if the Court denies its motion for a preliminary injunction.

Plaintiff concedes that the only harm it is suffering is monetary; indeed, it argues that the Court should grant it injunctive relief to protect it from "the loss of advertising revenue from Defendants." Doc. 20 at 14. It claims, however, that sovereign immunity bars it from recovering money damages. Plaintiff is correct that sovereign immunity protects the University of Arkansas itself, but sovereign immunity does not shield Defendants, the Trustees of the University, from suit for damages in their individual capacity. *See Alden v. Maine*, 527 U.S.

706, 757 (1999) ("[A] suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct . . . so long as the relief is not sought from the state treasury but from the officer personally."); *Okruhlik v. Univ. of Ark. ex rel. May*, 255 F.3d 615, 627 (8th Cir. 2001) (holding that officials of the University of Arkansas were "not entitled to Eleventh Amendment immunity" when "sued in their individual capacity"). Plaintiff, therefore, is mistaken in asserting that sovereign immunity bars it from recovering money damages from Defendants in a court of law.

Alternatively, Plaintiff again argues that under *Elrod v. Burns*, 427 U.S. 347 (1976), any First Amendment violation causes irreparable harm.   But Plaintiff does not respond to Defendants' previous explanation that *Elrod* actually stands for the proposition that First Amendment injuries only cause irreparable harm if those injuries are non-monetary.  That is why the *Elrod* Court took pains to show that some members of the *Elrod* plaintiff class had switched political parties to avoid losing their jobs, thereby suffering the First Amendment injury of compelled association with a political party not of their choosing, while others were only being threatened with discharge at the time injunctive relief was sought and were being put to the unconstitutional choice of changing their parties or losing their jobs.  *See Elrod*, 427 U.S. at 373. Plaintiff suggests that if it were to change its mind and make the certification the Act requires, it would *then* "forfeit[] its First Amendment rights" and suffer irreparable harm.  Doc. 20 at 15. But that has not come to pass, and Plaintiff cannot obtain an injunction by speculating that it may one day suffer harms that, by its own choice, it is not currently suffering.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.


Respectfully submitted,

LESLIE RUTLEDGE
Attorney General

*/s/ Dylan L. Jacobs*
Nicholas J. Bronni (Ark. Bar No. 2016097)
  Arkansas Solicitor General
Michael A. Cantrell (Ark. Bar No. 2012287)
Dylan L. Jacobs (Ark. Bar No. 2016167)
  Assistant Solicitors General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-3661
Fax: (501) 682-2591
Dylan.Jacobs@arkansasag.gov

*Attorneys for Defendants*

## **<u>CERTIFICATE OF SERVICE</u>**

I, Dylan L. Jacobs, hereby certify that on January 18, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of the filing to any participants.

*/s/ Dylan L. Jacobs*
Dylan L. Jacobs