## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**ARKANSAS TIMES LP**                                                    **PLAINTIFF**

v.                                    **CASE NO. 4:18-CV-00914 BSM**

**MARK WALDRIP, et al.**                                          **DEFENDANTS**

## ORDER

I routinely instruct jurors to follow my instructions on the law, even if they thought the law was different or think it should be different. This case presents an occasion in which I must follow the same principle, which is that I have a duty to follow the law even though, before researching the issue, I thought the law required a different outcome than the one ultimately reached.

Plaintiff Arkansas Times LP's motion for a preliminary injunction [Doc. No. 2] is denied, and defendants' motion to dismiss [Doc. No. 15] is granted. Defendants' motion for leave to file a reply brief [Doc. No. 22] is denied as moot.

## I. BACKGROUND

The Arkansas Times challenges the constitutionality of Act 710, a state statute requiring that companies doing business with state entities certify that they are not boycotting Israel. The relevant facts are as follows:

Act 710 prohibits state entities from entering into contracts with companies for goods or services unless those companies certify in writing that they are not currently engaged in, nor will they engage in for the duration of their contract, a "boycott of Israel." Ark. Code

Ann. § 25-1-503(a).  It defines a "boycott of Israel" to mean:

> [E]ngaging in refusals to deal, terminating business activities, or
> other actions that are intended to limit commercial relations with
> Israel, or persons or entities doing business in Israel or in
> Israeli-controlled territories, in a discriminatory manner.

*Id.* § 25-1-502(1)(A)(i).  If a company fails to provide this written certification, it may still

contract with a state entity—but it must first offer to provide its goods or services for at least

a twenty percent discount.  *Id.* § 25-1-503(b)(1).  The law does not apply to contracts with

a potential value of less than $1,000.  *Id.* § 25-1-503(b)(2).

This law is not the only one of its kind.  Dozens of states have passed similar statutes.

*See* Br. Opp. Pl. Mot. Prelim. Inj. at 2 n.1, Doc. No. 14.  There is a somewhat similar federal

law authorizing the "President [to] issue regulations prohibiting any United States person

. . . from . . . support[ing] any boycott fostered or imposed by a foreign country against a

[friendly] country."  50 U.S.C. § 4607(a)(1) (1979); *see also* Anti-Boycott Act of 2018, Pub.

L. No. 115-232, §§ 1771–74.

The Arkansas Times is a weekly newspaper in Arkansas.  Its publisher and chief

executive officer is Alan Leveritt.  For many years, the Times has contracted with Pulaski

Technical College, now the University of Arkansas–Pulaski Technical College ("Pulaski

Tech"), to publish advertisements for the college.  In 2016, the Times entered into twenty-

two advertising contracts with Pulaski Tech for amounts over $1,000; in 2017, it entered into

thirty-six such contracts.  In 2018, the Times entered into twenty-five such contracts before

October.

In October 2018, the Arkansas Times and Pulaski Tech were preparing to enter into a new advertising contract. Pulaski Tech, consistent with Act 710's certification requirements, informed Leveritt that he would have to certify that the Times is not currently engaging in, nor would for the duration of the contract engage in, a boycott of Israel. Leveritt declined to do so, citing the Times's First Amendment rights. Specifically, the Times takes the position that it should not have to choose between doing business with the state and its right to freedom of expression. Leveritt also asserts that while he was not afforded an opportunity to decline certification and to offer a twenty percent reduction in price, such a discount is unacceptable.

The Times has previously complied with the law's certification provision on dozens of occasions, as it entered into many advertising contracts with Pulaski Tech after Act 710 went into effect. Further, while the paper's editorial board has been critical of Act 710, it appears that the Times has never engaged in, nor ever written in support of, a boycott of Israel. *See* Lindsey Millar, *Arkansas Times challenges law that requires state contractors to pledge not to boycott Israel in federal court*, Arkansas Times: Arkansas Blog (Dec. 11, 2018) ("The Times has never participated in a boycott of Israel or editorialized in support of one."). Nothing indicates the Times will engage in such a boycott.

Because of the Times's refusal to certify, the parties did not execute a contract in October 2018, and there are no existing contracts between them. It is also very unlikely that there will be any future advertising contracts between the Times and Pulaski Tech because

of this certification requirement.

The Arkansas Times brings this lawsuit asserting that Act 710 violates the First and Fourteenth Amendments.  It seeks a preliminary injunction prohibiting the defendants from enforcing the law's certification provision while this suit is pending.  Defendants oppose the motion and have moved to dismiss.

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008).  Whether to grant such relief is within the sound discretion of the district court.  *See Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006). A party seeking a preliminary injunction must prove that: (1) it will suffer irreparable harm if the injunction is denied; (2) the harm to the movant, if the injunction is denied, outweighs the harm to the non-movant if the injunction is granted; (3) there is a likelihood of success on the merits; and (4) an injunction is in the public's interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

Generally, a "fair chance" of prevailing on the merits is required to grant a preliminary injunction.  *Planned Parenthood of Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 730–31 (8th Cir. 2008).  "Where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute, however, the moving party must make a more rigorous showing that it is likely to prevail on the merits."  *Planned Parenthood of Arkansas*

& *E. Oklahoma v. Jegley*, 864 F.3d 953, 957–58 (8th Cir. 2017) (quotations omitted).  This

heightened standard "reflects the idea that governmental policies implemented through

legislation or regulations developed through presumptively reasoned democratic processes

are entitled to a higher degree of deference and should not be enjoined lightly." *Rounds*, 530

F.3d at 732 (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

## III. DISCUSSION

The Arkansas Times presents two arguments challenging the constitutionality of Act

710's certification requirement.  First, it asserts that the law impermissibly compels speech

regarding contractors' political beliefs, association, and expression.  Second, it asserts that

the law impermissibly restricts state contractors from engaging in protected First Amendment

activities, including boycott participation and boycott-related speech, without a legitimate

justification.  Defendants dispute both of these arguments and assert that the Times lacks

standing to bring its boycott-restriction claim.

While the Times has standing to bring both of its claims, a preliminary injunction is

denied because the Arkansas Times has failed to show that a boycott of Israel, as defined by

Act 710, is protected by the First Amendment.

### A.    Standing

The Arkansas Times has standing to bring its boycott-restriction claim because it

suffered an injury in fact when it lost a government contract after refusing to comply with

Act 710's certification provision.   It does not have to allege that it intends to boycott Israel

or that it would have boycotted Israel but for Act 710.

Federal courts may hear only "cases" and "controversies."  U.S. Const. art. III, § 2, cl.1.  "[T]here is no case or controversy unless the party initiating the [lawsuit] has standing to sue." *Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transp.*, 831 F.3d 961, 966 (8th Cir. 2016).  To establish that it has standing to bring this lawsuit, the Arkansas Times must show that it suffered an "injury in fact." *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "Injury-in-fact means an actual or imminent invasion of a concrete and particularized legally protected interest." *Kinder v. Geithner*, 695 F.3d 772, 776 (8th Cir. 2012).

There are two common ways of demonstrating an injury in fact in First Amendment cases. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016). First, a plaintiff may allege "an intention to engage in a course of conduct . . . proscribed by a statute" such that the plaintiff risks prosecution or some other penalty,  including the loss of a government contract. *Id.* (internal quotation marks omitted) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).  Second, it may allege self-censorship. *Id.*; *see also 281 Care Comm. v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011) (noting that to show self-censorship, a plaintiff "needs . . . to establish that he would like to engage in arguably protected speech, but that he is chilled from doing so by the existence of the statute.").

Critically, these two methods are used in cases in which plaintiffs are challenging the constitutionality of a law *before* facing prosecution or otherwise suffering from the adverse

consequences of noncompliance. *See 281 Care Comm.*, 638 F.3d at 627; *Zanders v. Swanson*, 573 F.3d 591, 593–94 (8th Cir. 2009). *See also Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).

The Times, however, has *already* sustained an injury from Act 710, and its standing to bring the boycott-restriction claim does not derive from a risk of future injury. It lost its contract with Pulaski Tech, and therefore suffered a concrete and quantifiable economic loss, because it refused to comply with Act 710's certification provision. *See Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1033 (D. Ariz. 2018) (noting that the resulting financial harm from plaintiff's failure to certify under a similar Arizona statute is an independent basis for standing) (citing *Ariz. Right to Life Pol. Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

This is sufficient to confer standing upon the Times to bring its boycott-restriction claim. *See also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591–92 (8th Cir. 2009) ("Article III generally requires injury to the plaintiff's personal legal interests, but that does not mean that a plaintiff with Article III standing may only assert his own rights or redress his own injuries.") (internal citation omitted); Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, 13B Fed. Prac. & Proc. § 3531.16, at 362–63 (3d ed. 2008).

B.     <u>Likelihood of Success on the Merits</u>

The Times is unlikely to prevail on the merits of its First Amendment claims because it has not demonstrated that a boycott of Israel, as defined by Act 710, is protected by the

First Amendment.  This finding diverges from decisions recently reached by two other federal district courts. *Jordahl*, 336 F. Supp. 3d at 1016; *Koontz v. Watson*, 283 F. Supp. 3d 1007, 1021–22 (D. Kan. 2018).

### 1. Applicable First Amendment Standards and "Boycotts of Israel"

The First Amendment, made applicable to the states by virtue of the Fourteenth Amendment's Due Process Clause, forbids the government "from dictating what we see or read or speak or hear." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).  It "protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976).  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).

Certification requirements for obtaining government benefits, including employment or contracts, that merely elicit information about an applicant generally do not run afoul of the First Amendment.  *See United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995).  They become constitutionally problematic, however, when they require that an applicant certify that it "will not engage . . . in protected speech activities" or "associational activities within constitutional protection." *Cole v. Richardson*, 405 U.S. 676, 680 (1972).  They may also violate the Constitution if they require an applicant to endorse or espouse a particular message.  *See id.*; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217–18 (2013) (holding that the government could not require organizations to adopt

a policy opposing prostitution in order to receive government funds).

Act 710 requires contractors to certify that they will not refuse to deal with Israel or with companies that do business with Israel.  A boycott of Israel, as defined by Act 710, concerns a contractor's purchasing activities with respect to Israel.  While the statute also defines a boycott to include "other actions that are intended to limit commercial relations with Israel," Ark. Code Ann. § 25-1-502(1)(A)(i), this restriction does not include criticism of Act 710 or Israel, calls to boycott Israel, or other types of speech.  Familiar canons of statutory interpretation, such as constitutional avoidance and *edjusdem generis*, counsel in favor of interpreting "other actions" to mean commercial conduct similar to the listed items. *See Bakalekos v. Furlow*, 410 S.W.3d 564, 571 (Ark. 2011); *Edwards v. Campbell*, 370 S.W.3d 250, 253 (Ark. 2010).

To prevail under either of its theories, the Times must demonstrate that a refusal to deal, or its purchasing decisions, fall under the First Amendment, which protects speech and inherently expressive conduct.  *See Pickup v. Brown*, 740 F.3d 1208, 1225 (9th Cir. 2014) ("The Supreme Court has made clear that First Amendment protection does not apply to conduct that is not 'inherently expressive.'") (quoting *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 66 (2006)).

*2. A Boycott Is Neither Speech Nor Inherently Expressive Conduct*

A boycott of Israel, as defined by Act 710, is neither speech nor inherently expressive conduct.

First, a boycott is not purely speech because, after putting aside any accompanying explanatory speech, a refusal to deal, or particular commercial purchasing decisions, do not communicate ideas through words or other expressive media. *See Jordahl*, 336 F. Supp. 3d at 1042 ("[T]he decision not to buy a particular brand of printer to show support for a political position, may not be deserving of First Amendment protections on the grounds that such action is typically only expressive when explanatory speech accompanies it."); *see also Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (explaining different types of expressive media).

Second, such conduct is not "inherently expressive." *FAIR*, 547 U.S. at 66. In *FAIR*, an association of law schools restricted military recruiting on campuses to express their opposition to the military's then-existing "Don't Ask, Don't Tell" policy. *Id.* at 51. Congress responded to this restriction by passing the Solomon Amendment, which denied federal funding to law schools unless they allowed military recruiters to have equal access to campuses. *Id.* The law schools asserted that the law violated the First Amendment, *id.*, but a unanimous Supreme Court rejected the challenge, holding that such conduct was "not inherently expressive" because the actions "were expressive *only* because the law schools accompanied their conduct with speech explaining it." *Id.* at 66 (emphasis added).

Specifically, "[a]n observer who s[aw] military recruiters interviewing away from the law school" would have "no way of knowing" why recruiters were interviewing off-campus absent any explanatory speech. *Id.* Further, explanatory speech describing the purpose of

10

the military restriction did not transform the law school's unexpressive conduct into expressive conduct. *Id.* "[I]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id.*

*FAIR* is controlling. *See Jordahl v. Brnovich,* Case No. 18-16896, Dkt. No. 26, slip op. at 5 (9th Cir. Oct. 31, 2018) (order denying stay of preliminary injunction) (Ikuta, J., dissenting). Like the law schools' decision to prevent military recruiters from coming to campus, the decision to engage in a primary or secondary boycott of Israel is "expressive only if it is accompanied by explanatory speech." *Id.* Until then, the motivations behind a contractor's private purchasing decisions are entirely unknown to the public.

It is highly unlikely that, absent any explanatory speech, an external observer would ever notice that a contractor is engaging in a primary or secondary boycott of Israel. Very few people readily know which types of goods are Israeli, and even fewer are able to keep track of which businesses sell to Israel. Still fewer, if any, would be able to point to the fact that the *absence* of certain goods from a contractor's office mean that the contractor is engaged in a boycott of Israel. *See id.*; *c.f. FAIR*, 547 U.S. at 66.

Instead, an observer would simply believe that the types of products located at the contractor's office reflect its commercial, as opposed to its political, preferences. In most, if not all cases, a contractor would have to explain to an observer that it is engaging in a boycott for the observer to have any idea that a boycott is taking place. And under *FAIR*, the

11

fact that such conduct *may* be subsequently explained by speech does not mean that this conduct is, or can be, transformed into inherently expressive conduct.  547 U.S. at 66 ("The fact that . . . explanatory speech is necessary is strong evidence that . . . conduct . . . is not so inherently expressive that it warrants protection."); *see also Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 226 (1982) ("It would seem even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment.").

The Arkansas Times's argument that an individual's refusal to deal, or his purchasing decisions, when taken in connection with a larger social movement, become inherently expressive is well-taken but ultimately unpersuasive.  Such an argument is foreclosed by *FAIR*, as individual law schools were effectively boycotting military recruiters as part of a larger protest against the Don't Ask, Don't Tell policy.

For these reasons, the First Amendment does not protect the Arkansas Times's purchasing decisions or refusal to deal with Israel.

### *3. No Unqualified Constitutional Right To Boycott*

The Times's argument that the Supreme Court's decision in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) creates an unfettered, black-letter right to engage in political boycotts is unpersuasive.

*Claiborne* concerned a primary boycott of white-owned businesses in Port Gibson, Mississippi by civil rights activists in order to protest racial discrimination.  458 U.S. at

899–900.  The boycotters' constitutional rights were being violated by local government officials, many of whom also owned the businesses being boycotted.  *Id.*  The Supreme Court observed that "[t]he right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself."  *Id.* at 914.

Crucially, *Claiborne* did not "address purchasing decisions or other non-expressive conduct."  *Jordahl*, Case No. 18-16896, Dkt. No. 26 slip op. at 5 (9th Cir. Oct. 31, 2018) (order denying stay of preliminary injunction) (Ikuta, J., dissenting); *see also FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 426–27 (1990).  Rather, the Court arrived at its decision only after carefully inspecting the various elements of the boycott, which consisted of meetings, speeches, and non-violent picketing.  *Claiborne*, 458 U.S. at 907–08.  It concluded that "[e]ach of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments."  *Id.*  The Court, however, did not hold that individual purchasing decisions were protected by the First Amendment.  *See id.*

Similarly, under *Claiborne*, the Times may write and send representatives to meetings, speeches, and picketing events in opposition to Israel's policies, free from any state interference.  It may even call upon others to boycott Israel, write in support of such boycotts, and engage in picketing and pamphleteering to that effect.  This does not mean, however, that

13

its decision to refuse to deal, or to refrain from purchasing certain goods, is protected by the First Amendment.

Even if *Claiborne* stands for the proposition that the act of refusing to deal enjoys First Amendment protection, such a right is limited in scope. The Court emphasized that the boycotters in *Claiborne* "sought to vindicate rights of equality and freedom that lie at the heart of the Fourteenth Amendment itself." *Id.* at 914. Consequently, *Claiborne* applies to nonviolent, primary political boycotts to vindicate particular statutory or constitutional interests. 458 U.S. at 914; *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 508 (1988). *But see Jordahl*, 336 F. Supp. 3d at 1041. This understanding was reiterated in *FTC v. Superior Court Trial Lawyers Association*, where the Court explained that its decision in *Claiborne* was based on its particular facts—namely, a primary boycott by those whose constitutional rights were being infringed upon and against those who were infringing upon those rights. 493 U.S. at 426–27.

This, however, does not include political boycotts directed towards foreign governments concerning issues that do not bear on any domestic legal interest. In *International Longshoremen's Association*, a case that was decided just months before *Claiborne*, the Court held that a labor union's secondary boycott of Soviet goods to protest the U.S.S.R.'s invasion of Afghanistan was not protected by the First Amendment. 456 U.S. at 212. Although the union's boycott was clearly motivated by political interests, *see id.* at 223–26, the Court unanimously held that a prohibition of such a boycott did "not infringe

14

upon the First Amendment rights of the [union] and its members." *Id.* at 226.  If one simply substitutes the words "labor union," "Soviet," "U.S.S.R.," and "Afghanistan" with "newspaper," "Israeli," "Israel," and "West Bank," then it becomes clear that *International Longshoremen's Association* is largely the same case as the Times's.

While *International Longshoremen's Association* was decided against the broader context of federal labor law, the Court held that there is no unqualified right to boycott or a constitutional right to refuse to deal, or perhaps no First Amendment interest in boycotting at all.  *See id.*  It appears that *Claiborne*, which immediately followed *International Longshoremen's Association*, created a narrow exception to this rule based on particular facts that are not present here.

The Eighth Circuit has reaffirmed these aspects of *Claiborne* and *International Longshoremen's Association*.  *See Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191 (8th Cir. 1994).  In *Beverly Hills*, a union's distribution of handbills to promote a consumer boycott of a grocery store was protected by the First Amendment and a complete defense to the store's claim of tortious interference.  *Id.* at 196–97.  Applying *Claiborne*, the Eighth Circuit noted that peaceful pamphleteering was independently protected by the First Amendment.  *Id.*  It did not hold, however, that refusals to deal or commercial purchasing decisions are protected by the First Amendment.  Further, if *Beverly Hills* does stand for such a proposition, it appears, like *Claiborne*, limited to the fact that the union was promoting the boycott to vindicate a

15

statutory or constitutional interest—namely, to protest the grocery store's discriminatory treatment of black workers.  In contrast, the purpose of the union's boycott in *International Longshoremen's Association* was not to vindicate any such statutory or constitutional interest.

For these reasons, *Claiborne* does not hold that individual purchasing decisions are constitutionally protected, nor does it create an unqualified right to engage in political boycotts.  In the years following *Claiborne*, it does not appear that the Supreme Court or any court of appeals has extended *Claiborne* in such a manner.  *See, e.g.*, *Superior Court Trial Lawyers Ass'n*, 493 U.S. at 426; *Allied Tube & Conduit Corp.*, 486 U.S. at 492; *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 968 F.2d 286, 297 (2d Cir. 1992).

### 4. Conclusion

The Arkansas Times is unlikely to succeed on either of its theories because, as discussed above, a boycott of Israel, as defined by Act 710, is not speech, inherently expressive activity, or subject to independent constitutional protection under *Claiborne*.

## IV. MOTION TO DISMISS

Because engaging in a boycott of Israel, as defined by Act 710, is neither speech nor inherently expressive conduct, it is not protected by the First Amendment.  Accordingly, the Arkansas Times has failed to state a claim upon which relief may be granted.  *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  Defendants' motion to dismiss [Doc. No. 15] is therefore granted.

## V. CONCLUSION

For the foregoing reasons, the Arkansas Times's motion for a preliminary injunction [Doc. No. 2] is denied, and defendants' motion to dismiss [Doc. No. 15] is granted. Defendants' motion for leave to file a reply brief [Doc. No. 22] is denied as moot.  This case is dismissed with prejudice.

IT IS SO ORDERED this 23rd day of January 2019.

UNITED STATES DISTRICT JUDGE

17